669 F.2d 426
 5 Collier Bankr.Cas.2d 1281, 8 Bankr.Ct.Dec. 874,
Bankr. L. Rep. P 68,523
 In re Donald S. RIMGALE, Debtor-Appellant.
Mary RAVENOT, Incompetent, by Gordon J. Feltes, her father
and next friend and conservator of her estate,
Creditor-Appellee,
v.
Donald S. RIMGALE, Debtor-Appellant.
 No. 81-1455.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 1, 1981.
Decided Jan. 18, 1982.
 
 Ray Jeffrey Cohen, Chicago, Ill., for debtor-appellant.
 John C. Griffin, Chicago, Ill., for creditor-appellee.
 Before CUMMINGS, Chief Judge, FAIRCHILD, Senior Circuit Judge, and BROWN, Senior District Judge.*
 CUMMINGS, Chief Judge.
 
 
 1
 This appeal presents for the first time in the Seventh Circuit[1] the need to construe Section 1325 of the Bankruptcy Reform Act, 11 U.S.C. § 1325 (1978). Donald Rimgale, the Chapter 13 debtor, filed a plan that proposed to pay $120 a month for 42 months to various unsecured creditors. The largest of the claims represented a tort judgment owed to Mary Ravenot. Although the judgment debt would not have been dischargeable in a straight Chapter 7 bankruptcy under 11 U.S.C. § 523(a)(4) or (6), it could be discharged under the more generous provisions that obtain once a Chapter 13 plan is successfully completed. 11 U.S.C. § 1328(a). The bankruptcy judge confirmed Rimgale's proposed plan over the objections of Mary Ravenot's representative. On appeal, the district judge reversed. Because we cannot endorse either the district judge's construction of the statute or the bankruptcy judge's cursory inquiry into the debtor's good faith in proposing the plan, we remand for additional proceedings in the bankruptcy court.
 
 I. The Statutory Background
 
 2
 One of Congress' purposes in enacting the Bankruptcy Reform Act of 1978 was to make the old Chapter XIII provisions more accessible and attractive to individual debtors. Liberalized provisions, Congress reasoned, would benefit both debtors and creditors. Debtors would be given more latitude to work out debt composition plans, thus avoiding the stigma of straight bankruptcy. Creditors would receive total or substantial repayment under a Chapter 13 plan, but little or nothing in a Chapter 7 liquidation.[2]
 
 
 3
 To make Chapter 13 work, Congress altered the old Chapter XIII in three important ways. First, it expanded the class of debtors who could take advantage of Chapter 13. Formerly restricted to wage-earner debtors, Chapter 13 was made available to any individual with regular income, whether from wages or other sources.[3] Second, Congress eliminated the requirement that a plan be approved by a majority of unsecured creditors.[4] Concerned that in the past short-sighted and stubborn creditors had blocked feasible plans, Congress provided for creditors to be heard, 11 U.S.C. § 1324, but gave the bankruptcy judge the sole authority to confirm or reject a plan. It also set out the criteria he was to use, 11 U.S.C. § 1325:
 
 
 4
 (a) The court shall confirm a plan if-
 
 
 5
 (1) the plan complies with the provisions of this chapter and with other applicable provisions of this title;
 
 
 6
 (2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;
 
 
 7
 (3) the plan has been proposed in good faith and not by any means forbidden by law;
 
 
 8
 (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
 
 
 9
 (5) with respect to each allowed secured claim provided for by the plan-
 
 
 10
 (A) the holder of such claim has accepted the plan;
 
 
 11
 (B) (i) the plan provides that the holder of such claim retain the lien securing such claim; and
 
 
 12
 (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
 
 
 13
 (C) the debtor surrenders the property securing such claim to such holder; and
 
 
 14
 (6) the debtor will be able to make all payments under the plan and to comply with the plan.
 
 
 15
 Finally, Congress added an incentive for debtors to complete performance under the confirmed plan. 11 U.S.C. § 1328 provides that a debtor who has carried out his plan is entitled to a discharge of virtually all debts provided for in the plan or disallowed.[5] Thus a Chapter 13 debtor may be discharged from a variety of debts that a Chapter 7 bankrupt remains obligated to pay at the conclusion of a liquidation.
 
 
 16
 The statutory modification of Chapter 13 has had both intended and unintended effects. The number of Chapter 13 cases has increased sharply.[6] Many of them correspond closely to the idealized case Congress had in mind when it wrote the legislation: the debtor, given time and relief from harassment, is able to pay all or most of his debts. Increasingly, however, bankruptcy courts are seeing cases like the one before us, in which debtors propose less substantial, or even nominal, payments under a Chapter 13 plan, in order eventually to take advantage of Chapter 13's generous discharge provisions. Our task is to determine whether such a plan is permissible under the legislation Congress has drafted. In so doing, we are not free to rewrite the legislation as we think best, but neither are we able to ignore the broad equitable principles that have characteristically animated American bankruptcy law.
 
 II. Rimgale's Chapter 13 Plans
 
 17
 Donald Rimgale filed an original and two amended Chapter 13 plans in the bankruptcy court. Each involved about $6200 of unsecured consumer debt owed to half a dozen creditors, none with enough at stake apparently to file objections to the plan. Each also involved, and offered differing treatments of, a much larger debt owed to Mary Ravenot, the only creditor on whose behalf objections were made.
 
 
 18
 On May 24, 1979, the Circuit Court of Cook County, Chancery Division, entered a tort judgment against Rimgale and his wife Alice. Alice Rimgale had been employed as a psychiatric nurse at St. Joseph's Hospital in Joliet, Illinois, and had cared for Mary Ravenot, a twenty-six-year-old widow then undergoing psychiatric treatment and since adjudged incompetent. The Rimgales first won Mrs. Ravenot's confidence, then induced her to turn over to them all the proceeds of her husband's life insurance. The judgment against the Rimgales had the following components: (1) compensatory damages of $29,743 and $3,988.39 in prejudgment interest, for which the Rimgales were jointly and severally liable; (2) punitive damages of $5,000 against Donald Rimgale alone; and (3) attorney's fees and costs amounting to $8,857.75, again assessed against Donald Rimgale alone, based on his false pleading and bad faith in the tort litigation.[7] The judge also imposed a constructive trust in Mary Ravenot's favor on real and personal property acquired with the insurance money, including the Rimgales' house in Coal City, Illinois. What part of the judgment debt is secured by the constructive trust is a matter of dispute.[8] Until the filing of the bankruptcy, Mrs. Ravenot had garnished Rimgale's wages in the amount of $264 per month.
 
 
 19
 Rimgale's first plan, offered on December 18, 1979, listed Mary Ravenot's debt as entirely unsecured, treated both the compensatory damages and the attorney's fees as joint obligations of Donald and Alice Rimgale, and omitted the $5,000 in punitive damages altogether. The plan characterized that portion of the tort debt it listed as "disputed," although the judgment had become final.[9] The plan proposed to make no payments whatsoever to Mary Ravenot. Payments of $110 a month over thirty-six months would, according to the petition, pay 45% of the other unsecured claims.
 
 
 20
 The first amended plan, filed on April 3, 1980, has been lost and can be only partially reconstructed.[10] It represented that $55 semi-monthly payments over thirty-six months would pay one-third of the unsecured claims, but did not change the amount or proposed nonpayment of Mary Ravenot's claim.[11]
 
 
 21
 The second amended plan, filed on July 10, 1980, attempted to meet the objections of Mrs. Ravenot. It treated her debt as partly secured and partly unsecured. It estimated that she would receive $25,000 from the sale of the Rimgale house,[12] making the unsecured part of her claim $24,799.54. It increased payments under the plan to $120 a month and extended the term of the plan from thirty-six to forty-two months. An estimated 11% of unsecured claims would be paid. Mrs. Ravenot would receive about $2,700. This version of the plan was confirmed by bankruptcy judge Robert Eisen over the objections of Mrs. Ravenot's representative. Judge Eisen also lifted the automatic stay to permit Mrs. Ravenot's lawyers to set in motion the sale of the Coal City house.
 
 III. The Appeal to Judge Decker
 
 22
 Mrs. Ravenot thereupon appealed the confirmation order to the district court. There were three bases for the appeal. First, Mrs. Ravenot argued that she was not receiving at least as much as she would receive in a Chapter 7 liquidation, because her debt could not be discharged under Chapter 7 but would be discharged at the completion of a Chapter 13 plan. The plan therefore did not meet the "best interests" test of Section 1325(a)(4), infra. Second, Mrs. Ravenot contended that the plan had not been proposed in good faith and therefore violated Section 1325(a)(3). Third, Mrs. Ravenot argued that the bankruptcy judge had unduly restricted her arguments against the plan, contrary to the spirit of Section 1324. Judge Decker based his decision for Mrs. Ravenot on the first ground. In re Rimgale, No. 80 C 4862 (N.D.Ill., February 21, 1981). He found that the value of a nondischargeable claim for the whole of the unsecured debt could not easily be quantified. Nonetheless, he assumed that Mrs. Ravenot's objections were a sufficient indication that the claim under Chapter 7 was worth more than the $2,700 she would receive over a forty-two month period under the Chapter 13 plan. Because he found the failure to meet the "best interests" test dispositive, Judge Decker did not reach the good-faith or due process issues.
 
 IV. The Appeal to this Court
 
 23
 Donald Rimgale has challenged Judge Decker's interpretation of the statute in this Court. We agree that Judge Decker's analysis cannot stand. The language of the "best interests" test in Section 1325(a)(4) precludes it:
 
 
 24
 (T)he value, as of the effective date of the plan, of property to be distributed under the plan on account of each unsecured claim (must) not (be) less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date.
 
 
 25
 What is to be compared is the total of the payments to the creditor, discounted to present value, and the amount the creditor would receive in a straight liquidation. "(T)he amount that would be paid on such claim if the estate of the debtor were liquidated" (emphasis added) does not include additional amounts that a creditor may be able to collect after a liquidation, if he can keep the judgment alive. Accord, In re Syrus, 12 B.R. 605, 608 (Bkrtcy., D.Kans.1981). If Judge Decker's interpretation were right, any creditor with a nondischargeable debt could block a Chapter 13 plan by insisting that his claim might some day be satisfiable in full. Such a creditor would have a virtual veto over a Chapter 13 plan, while ordinary unsecured creditors have not even a vote. The generous discharge provisions of Chapter 13 would be illusory, subject to abrogation whenever a creditor with the sort of claim they cover objected to the plan. As a quid pro quo for not objecting, such a creditor might be able to insist on specific levels of repayment, although the statute itself has no explicit minimum payment requirement. In short, this reading of the "best interests" test undercuts the limiting of creditors' power and the inducement of broad discharges, both integral parts of Congress' revision of Chapter 13.
 
 
 26
 We cannot accept Rimgale's further argument, however, that Congress intended the confirmation of Chapter 13 plans to be routine if the "best interests" test is met. In eliminating the requirement that a majority of creditors approve a plan, Congress did not also eliminate all scrutiny of plans. Instead it transferred the decision to the bankruptcy judge, aided by the Chapter 13 trustee.[13] It is the bankruptcy court's duty to evaluate the good faith of the plan under Section 1325(a)(3). As the Eighth Circuit has noted,
 
 
 27
 "(a) comprehensive definition of good faith is not practical. Broadly speaking, the basic inquiry should be whether or not under the circumstances of the case there has been abuse of the provisions, purpose, or spirit of (the Chapter) in the proposal * * *."
 
 
 28
 In re Terry, 630 F.2d 634, 635 (8th Cir. 1980), (quoting 9 Collier on Bankruptcy, P 9.20 at 319 (14th ed. 1978)).
 
 
 29
 This inquiry imposes a considerable responsibility on bankruptcy judges. And the conduct comprehended under the rubric "good faith" will have to be defined on a case-by-case basis as the courts encounter various problems in the administration of Chapter 13's provisions.[14]
 
 
 30
 We would emphasize only a few points. The legislative history suggests that Congress intended Chapter 13 for the benefit of debtors who could, given time, satisfy their creditors in full or in substantial measure.[15] Nonetheless, Congress eschewed setting any minimum levels of repayment that a debtor must propose to qualify for Chapter 13 relief. Thus good faith cannot be treated as a license to read into the statute requirements Congress did not enact, e.g., a requirement that a plan pay 70% of unsecured claims to qualify for the discharge benefits.[16] Nor can good faith be defined as the absence of any conduct that would traditionally have barred discharge, without rendering Chapter 13's discharge provisions nugatory.[17] But the opposite extreme, that the good-faith requirement adds nothing to the other criteria for confirmation, is equally unsupportable.
 
 
 31
 We therefore agree with the analysis of District Judge Ingram in In re Burrell, 6 B.R. 360 (N.D.Cal.1980). He held that a flat 70% repayment requirement was erroneous and remanded to the bankruptcy judge for proceedings on the good-faith issue.
 
 
 32
 The correct approach * * * is to treat the issues of substantiality and best effort as elements of good faith. Unless the courts have discretion to consider such factors, the danger exists that Chapter 13 plans could become shams that would emasculate the safeguards that Congress has included in Chapter 7 to prevent debtor abuse of the bankruptcy laws. The courts retain discretion to prevent such abuse, and that discretion can be exercised effectively through a meaningful interpretation of the good faith requirement of § 1325(a)(3). In each case, the bankruptcy court must consider the debtor's entire circumstances to determine whether his plan proposes to make meaningful payments to unsecured creditors. In making that determination, the courts should be mindful of the fact that the unsecured creditors must rely on the court to give meaning to the congressional intent that they receive substantial payments. Within these guidelines, the courts should proceed on a case-by-case basis. 6 B.R. 360, 366.
 
 
 33
 The following list, by no means exhaustive, is intended to guide the bankruptcy judge's inquiry on remand:
 
 
 34
 (1) Does the proposed plan state Rimgale's secured and unsecured debts accurately?[18]
 
 
 35
 (2) Does it state Rimgale's expenses accurately?[19]
 
 
 36
 (3) Is the percentage of repayment of unsecured claims correct?[20]
 
 
 37
 (4) If there are or have been deficiencies in the plan, do the inaccuracies amount to an attempt to mislead the bankruptcy court?[21]
 
 
 38
 (5) Do the proposed payments indicate "a fundamental fairness in dealing with one's creditors," In re Beaver, 2 B.R. 337, 340 (Bkrtcy.S.D.Cal.1980)?[22]
 
 
 39
 If the court does undertake to ascertain the good faith of this petition in a more than perfunctory way, Mrs. Ravenot's due process objections will of necessity be overcome.
 
 
 40
 The judgment of the district court is vacated and the case remanded to the bankruptcy court for further proceedings consistent with this opinion. Costs to appellant.
 
 
 
 *
 The Honorable Wesley E. Brown, Senior District Judge of the District of Kansas, is sitting by designation
 
 
 [1]
 Seemingly the only court of appeals to address similar issues to date is the Eighth Circuit. In In re Terry, 630 F.2d 634 (8th Cir. 1980), the court held that a debtor whose expenses exceeded his income and whose plan therefore proposed no payments could not use Chapter 13. It offered alternative rationales: the definitional Sections 109(e) and 101(24) assume that a Chapter 13 debtor can make payments; and a zero-payment plan cannot be filed in good faith because it amounts to an abuse of Chapter 13's discharge provisions
 
 
 [2]
 See, e.g., S.Rep.No. 95-989, 95th Cong., 2d Sess., p. 12, (1978) U.S.Code Cong. & Admin.News, 5787, 5799:
 As in current law, 100 percent payment plans will be encouraged by the limitation on availability of a (second, later) discharge in section 727(a) (8). This kind of plan has provided great self-satisfaction and pride to those debtors who complete them (sic), and at the same time effect a maximum return to creditors.
 See also H.Rep.No.95-595, 95th Cong., 2d Sess., p. 118, (1978) U.S.Code Cong. & Admin.News, 6079:
 Chapter 13 * * * protects a debtor's credit standing far better than a straight bankruptcy, because he is viewed by the credit industry as a better risk. In addition it satisfies many debtors' desire to avoid the stigma attached to straight bankruptcy and to retain the pride attendant on being able to meet one's obligations. The benefit to creditors is self-evident: their losses will be significantly less than if their debtors opt for straight bankruptcy.
 The history of Chapter XIII and Chapter 13 is conveniently summarized in In re Polak, 9 B.R. 502, 507-509 (W.D.Mich.1981).
 
 
 [3]
 The effect of this change is to make Chapter 13 available to pensioners, social security recipients, self-employed people, professional people (except stockbrokers and commodity brokers), proprietors of small businesses, and certain farmers. J. Lee, Chapter 13 nee Chapter XIII, 53 Amer.Bankruptcy L.J. 303, 304 (1979)
 
 
 [4]
 That requirement was in repealed 11 U.S.C. § 1052. Note that under that Section the vote on a plan was weighted according to the amount of the allowed claim. Had Rimgale filed under Chapter XIII, Mrs. Ravenot could have prevented confirmation singlehandedly. Section 1324 of the new Act provides only for a confirmation hearing and an opportunity for creditors to file objections to the plan
 
 
 [5]
 Section 1328(a) exempts from discharge certain long-term indebtedness and alimony and child support payments
 
 
 [6]
 The following table is adapted from the 1981 Annual Report of the Director of the Administrative Office of the United States Courts, p. 10
 Filings During the Twelve-Month Periods
 Ended June 30, 1979 Through 1981
 Chapter XIII Chapter 13
1979 39,442 -----
1980 11,322 68,674
1981 56 128,225
 
 
 [7]
 Alice Rimgale never appeared, and a default judgment was entered against her
 
 
 [8]
 See note 12 infra
 
 
 [9]
 Rimgale's attorney offered an explanation for the "disputed" notation: the amount owed by Rimgale could not be ascertained until a finding was made about the relative culpability of Rimgale and of his wife, the instigator and chief beneficiary of the fraud on Mary Ravenot. The bankruptcy judge properly gave short shrift to this argument, because Mrs. Ravenot was entitled to look to either of the obligors for full satisfaction of the joint and several debt. Transcript of proceedings, 6/26/80, at 9 and 15. Rimgale's erroneous theory about joint and several liability is, of course, not applicable at all to the attorney's fees and costs assessed against him alone, though that amount too is listed as "disputed."
 
 
 [10]
 Rimgale's appendix contains only a portion of the final amended plan. Ravenot's supplemental appendix mistakenly reproduces the schedules of the original plan as the first amended plan. This Court sua sponte obtained the complete bankruptcy court record; all that appears there are the two covering sheets giving the amounts of payments, the duration of the plan, and the percentage of unsecured claims to be paid
 
 
 [11]
 The creditor's objections, filed on April 24, 1980, indicate that Mary Ravenot's claim was treated identically in the original and amended petitions. The change in percentage of repayment, from 45% to 33%, means that some additional unsecured claims must have been listed, but the record does not show what they were
 
 
 [12]
 In his original petition Rimgale had said his house was worth $48,000 and was mortgaged for $57,384. He did not list the mortgagee, Heritage First National Bank of Lockport, as a partially unsecured creditor. In objecting to the plan, Mrs. Ravenot's attorneys submitted an appraisal of the house showing a market value of $75,000. That figure is evidently the one relied upon in the final version of the plan, although $25,000 overstates the amount Mrs. Ravenot could realize after the mortgages were satisfied. At oral argument this Court was advised that while the appeal was pending the bankruptcy court had allowed the mortgagee to foreclose on the property and that there were no proceeds, after the foreclosure sale, to transmit to Mrs. Ravenot. It is clear from the foregoing that Mrs. Ravenot's whole claim must be treated henceforth as unsecured, and that the percentage of unsecured claims that the plan would pay must accordingly be revised downward
 
 
 [13]
 See Sections 1302 and 1324. The role of the trustee is discussed fully in J. Lee, Chapter 13 nee Chapter XIII, supra note 3, at 315-319
 
 
 [14]
 Accord, In re Kull, 12 B.R. 654, 658-660 (S.D.Ga.1981). "If confirmation depended entirely upon arithmetical computations or the absence of illegal activity in the case, there would be no need for a judge. Confirmation of a Chapter 13 plan requires the exercise of judicial discretion and assessment of evidence by a bankruptcy judge. The good faith requirement is one of the central, perhaps the most important confirmation finding to be made by the court in any Chapter 13 case. Each case must be judged on its own facts." Id. at 658. The court also lists some of the factors that are relevant to assessing good faith: income, expenses, attorney's fees under the plan, length of the proposed plan, debtor's motive in seeking Chapter 13 relief, earning ability and likelihood of future increases or decreases in income, special circumstances like large medical expenses, size of payments relative to means available, prior relief sought or obtained under the bankruptcy laws, circumstances under which debts were incurred, administrative difficulties with the plan, and the overall rehabilitative purposes of Chapter 13. Id. at 659
 C. Cyr, The Chapter 13 "Good Faith" Tempest: Analysis and Proposal for Change, 55 Amer.Bankruptcy L.J. 271 (1981), discusses several proposed but unenacted amendments to Section 1325(a)(3), including one offered by the National Bankruptcy Conference. They either add a "best efforts" requirement or focus on future as well as current earnings. They do not limit in any significant way the scope of the good-faith inquiry.
 
 
 [15]
 See note 2 supra
 
 
 [16]
 See, e.g., In re Burrell, 6 B.R. 360 (N.D.Cal.1980), reversing the bankruptcy court's imposition of such a requirement, 2 B.R. 650 (Bkrtcy., N.D.Cal.1980). Cf. C. Cyr, The Chapter 13 "Good Faith" Tempest, note 14 supra, at 286
 
 
 [17]
 J. Lee, Chapter 13 nee Chapter XIII, note 3 supra, at 318
 
 
 [18]
 For example, it appears that the first and perhaps subsequent petitions should have listed Rimgale's mortgagee as both a secured and unsecured creditor. There is still dispute about the size of Mary Ravenot's claim (she filed a claim for $51,079.01, but the petition in its final form lists a claim for $49,799.54). Probably no part of that claim can now be treated as secured, note 12 supra. And no effort has been made to describe what happened to the assets subject to the constructive trust, other than the house
 
 
 [19]
 For example, the petitions listed $600 in child support payments. At the time of the original petition, no divorce decree had been entered. At the time of the first amended petition, Rimgale was under order to pay $735 per month, but if he had listed that figure his estimated surplus of $210 per month would have dwindled to $75 and confirmation would have been denied under Section 1325(a)(6) ("the debtor will be able to make all payments under the plan and to comply with the plan"). By the time of the second amended petition, one of the Rimgale children had died, and the court had accordingly reduced the payments to $617. That figure is subject to revision as the needs of the Rimgale children change
 
 
 [20]
 For $3,960 to pay 45% of unsecured claims, the total of such claims should be $8,800. The original petition listed claims totaling $6,165.61. For $3,960 to pay 33% of unsecured claims, as the first amended petition advertised, such claims should total $12,000. Estimates of percentage repayment under the final plan range from a high of 17% (Rimgale) and 11% (Ravenot) if the Ravenot debt is partially secured, to a low of 9% (Rimgale) and 5% (Ravenot) if it is entirely unsecured. In simple arithmetical terms, the petitions are so defective that they do not permit an informed decision about confirmation
 
 
 [21]
 Donald Rimgale was represented in the state tort action and in these bankruptcy proceedings by the same attorney. Under the circumstances one might expect a more careful and knowledgeable preparation of the petition. Furthermore Rimgale, with this attorney acting for him, has a history of making false statements in judicial proceedings, as the Circuit Court's award of attorney's fees and costs attests
 
 
 [22]
 In this connection, the bankruptcy court may wish to examine the timing of the bankruptcy filings, the proportion of the total unsecured debt that is represented by the Ravenot judgment, and the equities of classifying together ordinary consumer debt and a judgment debt arising out of intentionally tortious conduct. See In re Sanders, 13 B.R. 320, 322-323 (Bkrtcy.D.Kans.1981) (classification of claims governed by Section 1122, which provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class"; claims subject to discharge only under Chapter 13 are not "substantially similar" to fully dischargeable claims)