**In re Moses W. BRAXTON, et al., Debtors.**

**Bankruptcy No. 90–02385.**

United States Bankruptcy Court, N.D. Florida, Panama City Division.

March 14, 1991.

Patricia Warren, Ft. Walton Beach, Fla., for debtors.

W. Kirk Brown, Tallahassee, Fla., for FCB.

Walter W. Kelley, Albany, Ga., trustee.

### ORDER DENYING CONFIRMATION OF CHAPTER 12 PLAN

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS MATTER came before the court on March 8, 1991 for confirmation of the Chapter 12 farm plan filed by the debtors in this case. In conjunction with the hearing on confirmation, we also considered motions for valuation of property of the estate. The Farm Credit Bank of Columbia (FCB), the holder of a claim in the amount of approximately $947,000 as of the date of the petition has objected to confirmation of the plan. The reasons set forth herein, confirmation of the debtors' plan will be denied.

The debtors in this case own a total of 1,036 acres on which they raise peanuts and conduct a hog raising operation. Additionally, they own and operate a feed mill and farm supply store in Cottondale, Florida known as Braxton Farm Supply. The debtors have non-farm income of approximately $32,000 per year from Mrs. Braxton's outside employment. The primary creditors in this case are FCB with a claim secured by a mortgage on the debtors' farm and crops, and the Farmers Home Administration (FmHA) with a claim of approximately $120,000 secured by livestock, equipment, the farm supply store and its inventory and office furniture. No payments have been made to FCB on its debt since March of 1987. The instant petition was filed on December 27, 1990, the day immediately before a scheduled summary judgment hearing in FCB's state court foreclosure action against the debtors.

This is the third Chapter 12 proceeding filed by these debtors, the first case having been filed on March 7, 1989, and voluntarily dismissed by the debtors on July 20, 1989. The second case was filed on January 3, 1990, and subsequently dismissed by the court on November 9, 1990 for failure of the debtors to timely file a plan as required by 11 U.S.C. § 1221. *In re Braxton*, 121 B.R. 632 (Bkrtcy.N.D.Fla.1990).

The plan filed by the debtors and under consideration here proposes to return to the Farm Credit Bank for credit based on value as determined by the court a total of 291.83 acres of the 1,036 acre farm owned by the debtors. The debtors would retain the remaining property and amortize the value of that property over twenty (20) years at an interest rate of 12%. The balance of Farm Credit Bank's claim would be treated as an unsecured claim. The plan further provides that the debtors may in the future sell any or all of the retained farm property and obtain releases of those parcels upon payment of the total sales price to FCB, with the remaining balance of the secured claim to be reamortized following the principal reduction. The property which the debtors propose to surrender to FCB consist of eighteen (18) separate irregularly shaped parcels of property ranging in size from .34 acres all the way up to 109.39 acres. These parcels are scattered throughout the debtors' farm. They are all low marshy areas which are totally unsuitable for farming and almost all are completely landlocked within the confines of the debtors' farm. With respect to one parcel, even the debtors assert that they do not have any legal access since they must cross railroad property to reach it.

With respect to the claim of FmHA, the plan proposes to pay the entire claim over a period of fourteen (14) years at an appropriate interest rate. The treatment of FmHA's claim has been agreed upon between FmHA and the debtors and accordingly FmHA has not objected to the plan as presented to the court.

In considering the confirmability of the debtors' proposed plan, it is necessary to determine the values of the various properties of the estate in order to determine the feasibility of the plan, the amount of the secured claim of FCB to be dealt with under the plan and the liquidation value of the estate in order to determine whether unsecured creditors would receive more under the plan than in liquidation.

With respect to the debtors' farm, we conducted a valuation hearing during the debtors' first Chapter 12 case and concluded that the value of the farm as a whole was $765,620. Both the debtor and FCB have agreed in this case to that sum as the current value of the farm as a whole. The major dispute with respect to the farm comes in valuing the parcels which the debtors propose to surrender to FCB. Farm Credit Bank presented Mr. Jerry Williamson who performed the original appraisal of the farm to evaluate the separate parcels proposed to be surrendered. Mr. Williamson's conclusion was that the total value of those tracts would be $77,600. The debtor did not present any appraisal evidence but merely asked that the court attribute to the parcels to be surrendered the average per acre value of the farm as a whole thus resulting in total value of those parcels of $195,252.86. The debtors offered nothing to contradict the conclusions of Mr. Williamson with regard to the individual parcels but merely claimed that they are relying on the values established by Mr. Williamson in his previous appraisal and that they should be permitted to do so. However, the debtors' own witness, Mr. Joe Busby, a farm consultant, testified that as far as he was concerned those separate parcels of property were of absolutely no use or value to anybody. Therefore, based on the uncontradicted evidence presented by FCB, we find that the value of the property proposed to be surrendered by the debtors to FCB is $77,600 thus leaving the value of the property proposed to be retained at $683,800. We would note that, given the testimony of the debtors' own witness, this valuation of the parcels proposed to be surrendered is extremely generous and any assertion by the debtors that useless wetlands should be considered to have the same value as productive crop land is totally preposterous.

The remaining items requiring valuation are those items which are security for the claim of FmHA. The major category of collateral for FmHA's claim is the swine herd of the debtors. As of the morning of the hearing, that herd consisted of approximately 2,318 head. The FmHA witness testified that the herd had a value of $105,000 to $106,000. Mr. Busby, on behalf of the debtors testified that the herd had a value of $90,121. However, Mr. Busby's worksheet which he prepared during the morning count and which contains the head count and prices per each category of pigs reflects an aggregate value of between $104,000 and $105,000. Farm Credit Bank's appraiser valued the livestock as of March 4, 1991, at $144,334. Three factors accounted for the major difference between the FCB valuation and those of the debtors in FmHA. The FCB valuation used market prices published in the Florida Livestock Market Report which reflected prices at markets several hundred miles away from the local area. The debtors' and FmHA's valuations utilized local auction sales. Secondly, as with any hog farming operation, the numbers and mixture of sizes vary almost from day to day. Thus, the numbers on March 4 were different from those on March 8. Finally, the debtors' valuation did not attribute any value to a total of 248 head consisting of 208 nursing baby pigs with their mothers plus a number of sows about to deliver baby pigs. According to the debtors' expert, this 248 head has no liquidation value due to the fact that any attempt to remove them from the premises would in all likelihood result in their death or that they would simply be unmarketable. Having considered all of the evidence regarding the value of the pigs, we find the value of the livestock to be $105,000.

In addition to the livestock at the farm on the day of the hearing, the debtor testified that he had sent 45 finished hogs to market that morning prior to the count but had not received the sales proceeds yet. Although the debtor did not know exactly how much he would be receiving, based on the finished weight of the hogs and the expected market price, we find that proceeds from those hogs would be in the range of $4,800. Additionally, the debtor testified that just a couple of days prior to the date of confirmation, he had used the proceeds of hog sales and purchased 23 tons of soy meal feed for the pigs at a price of $221 per ton. On the date of the hearing, his testimony reflected that he still had sixteen (16) to seventeen (17) tons of the feed remaining, which would therefore have a value of approximately $3,600. As of the date of the hearing, the total value of the livestock collateral to include proceeds in the form of receivables and feed purchased with proceeds was $113,400.

The next major item of collateral for the FmHA debt is the farm supply store and feed mill. This item consists of 1.46 acres of property located in downtown Cottondale, Florida with the store and feed mill equipment machinery located thereon. The debtor did not present any evidence regarding the valuation of this property. The FmHA county supervisor, Mr. Charles Snell appraised the property and determined a fair market value of $97,425 for it. The only other indication of value produced was the records from the county tax assessors office which reflected an assessed value for tax purposes of $35,909. The evidence of fair market value of $97,425 as testified to by Mr. Snell standing unrebutted, we find that as the fair market value of the feed mill and farm supply store. All parties were in agreement with respect to the value of the inventory and office furniture pledged to FmHA, those having values of $4,858 for the inventory and $625 for the office furniture.

The final category of collateral was farm equipment. The debtors' appraisal reflects value of the farm equipment at $50,700, the FCB appraisal reflects a value of $61,350, and the FmHA appraisal shows a value of $70,200. All three of the appraisers utilized similar methodology in arriving at their values and all seem to be familiar with the equipment. Accordingly, we find that the middle range valuation is appropriate and find the value of the farm equipment to be $61,350. The total fair market value for all of the collateral pledged to FmHA is, therefore, found to be $277,658.

■ Having determined the values of the various estate assets, we must now consider the confirmability of the debtors' plan. Farm Credit Bank objects to confirmation on numerous grounds, however, only three need be discussed here. Farm Credit Bank asserts that the plan cannot be confirmed because it was not filed in good faith, that it is not feasible, and that the value to be distributed under the plan to unsecured creditors is less than the amount that would be paid under a Chapter 7. In order to confirm a plan, the court is required to make specific findings of fact detailing evidence supporting the feasibility of the plan and explain how the debtors are capable of meeting their payment schedules. *In re Cornelison*, 901 F.2d 1073 (11th Cir.1990).

■ With respect to the requirement of 11 U.S.C. § 1225(a)(4) that "[T]he value as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under Chapter 7 of this title on such date" the debtors have totally failed to present any competent evidence. The only evidence by the debtor with respect to this issue was the testimony of Mr. Busby, the debtors' "expert" farm consultant. Mr. Busby prepared a detailed computerized farm plan and cash flow analysis utilizing the assumed debt restructuring as provided for in the debtors' Chapter 12 plan and with the values sought to be used by the debtors. However, despite repeated questions by counsel for FCB and by the court, Mr. Busby was unable to specify any amounts which would be paid under the plan on account of unsecured claims. Having found that the fair market value of the collateral pledged to FmHA is $277,658 while the secured claim of FmHA is only $120,000. It is clear that even in a Chapter 7 there would be substantial funds available to pay to the unsecured claimants. Accordingly, we cannot make a finding that the provisions of § 1225(a)(4) have been met since the debtors could not establish what, if any, would

be distributed under the plan on account of allowed unsecured claims.

■ With respect to the issue of feasibility, the debtors have once again failed to prove that their plan is confirmable. The summary of operations prepared by Mr. Busby in the farm plan assumes a debt service to FCB based on this court's finding a value of $195,252.86 for the land to be surrendered resulting in a $570,301.14 secured claim to be dealt with under the plan. However, the valuation as set forth herein results in a secured claim of FCB to be dealt with in the amount of $683,800. Secondly, the major source of income provided for in the farm plan is from the sale of finished hogs. In reviewing the detailed computerized analysis of the operations prepared by Mr. Busby, the projected income is based on an assumed price of forty-eight cents per pound for the finished hogs. However, the evidence presented in connection with valuation of the debtors' herd reflected prices for finished hogs ranging from forty to forty-five cents a pound and not forty-eight cents a pound. Even with the debt to be serviced at the level proposed by the debtors and finished hog prices higher than the current market, the summary of operations by the debtors results in a total of only $2,239 net cash available at the end of 1991 after payment of all operating expenses and debt service on secured claims. With the increased debt service to FCB based on the court's valuation and the probable reduction in total revenues based on actual market prices for the finished hogs, we cannot make a finding that the debtors will be able to make all of the payments required under the plan.

■ Finally, FCB asserts that the plan does not meet the requirement of § 1225(a)(3) that it has been proposed in good faith. The primary basis for this assertion is the fact that under the plan the debtor seeks to surrender to the Land Bank for credit against the secured claim eighteen (18) pieces of land which according to even the debtor's own expert are virtually useless to anybody. In attempting to justify this treatment of FCB's secured claim, the debtors cite this court's

decision in *In re O'Farrell*, 74 B.R. 421 in which case we stated "it is not the creditor's prerogative to select which or how much of the debtors' property is to be disposed under this provision" (§ 1222(b)(8)). *Id* at 423. The debtors' reliance on that passage is sorely misplaced. In *O'Farrell*, we specifically found that "the testimony adduced at hearing supported the continued usefulness and value of the severed portion." *Id.* In contrast, here the property which the debtors seek to abandon has, for the most part, absolutely no use. What the debtors have done has gone over their entire farm and selected those portions of the farm, wherever they may be, which they cannot use to generate income and have attempted to carve those out and surrender them. As previously pointed out, all of the parcels are low and wet and virtually all are landlocked within the interior of the debtors' farm. While at hearing the debtor acknowledged a requirement to do so, the plan as filed provided absolutely no access to the separate parcels. We find this attempt to surrender useless swamp land for credit at a value established for producing crop land to be absolutely unconscionable. This attempt considered in connection with the overall history of these debtors supports a finding that this plan has not been proposed in good faith.

Based on the foregoing findings and conclusions, we find that the debtors' farm plan does not meet the requirements of § 1225(a) of the Bankruptcy Code and accordingly confirmation is hereby denied.

DONE AND ORDERED.