**In re John GROFF and Lynda Groff, Debtors.**

**Bankruptcy No. 91–00438–JES.**

United States Bankruptcy Court, E.D. Wisconsin.

Aug. 23, 1991.

---

Terrence J. Byrne, Wausau, Wis., for debtors.

Robert A. Kennedy Jr., Crandon, Wis., for M & I Bank of Antigo.

Thomas J. King, Oshkosh, Wis., Trustee.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

M & I Bank of Antigo (the "Bank"), a secured creditor, has raised a myriad of objections to the debtors' chapter 13 plan. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

The debtors filed a 5-year plan providing for their retention of their principal residence and surrounding 30 acres, located on Robin Lane, Town of Aniwa, Wisconsin, subject to Bank's mortgage. The plan has been amended several times and is currently designated as debtors' "Fourth Amended Chapter 13 Plan." It also calls for the debtors to surrender to the Bank its remaining collateral (consisting of two 80-acre parcels of real estate and another home located in the Village of Aniwa, Wisconsin). It further encompasses debtors' surrender of other collateral consisting of jewelry to another lienholder, Elderon Truck & Equipment Co., in full payment of that particular debt. Monthly payments of $305 are to be paid under the plan and allocated as follows: $27.45 for trustee's fees, $193.55 for the Bank's secured claim, $76.61 for the Shawano County Treasurer on past due real estate taxes on the principal residence, and the balance of $7.39 for the unsecured creditors. It is estimated that the payments to the unsecured creditors will produce a small dividend slightly exceeding 1%.

The parties have agreed that the value of the debtors' principal residence with 30 acres is $23,500. Under the plan, the debtors shall pay $20,057, representing the net value of the Bank's collateral, after deducting unpaid real estate taxes. The $193.55 monthly payments allotted for the Bank on its secured claim have been calculated upon a 20-year amortization schedule at 10% interest. The entire balance becomes due to the Bank as a "balloon" in the 60th month of the plan, at which time the balance will be $18,055.10. As part of their plan, the debtors have also agreed to maintain a real estate tax escrow of $70 per month for current real estate taxes on their principal residence.

An evidentiary hearing was held on May 10, 1991 and on June 5, 1991. Thomas J. King, chapter 13 trustee, recommended confirmation, if the plan also provides for an immediate lifting of the stay should the debtors fail to maintain their plan payments. The debtors are agreeable to this proviso.

## THE BANK'S OBJECTIONS

The Bank has presented the following objections (each of which shall be separately discussed):

1. Impermissible modification of its mortgage under § 1322(b)(2).
2. Prohibition against a balloon payment under § 1322(c).
3. Improper valuation of the Bank's secured claim.

4. Impermissible reduction in the contract interest rate.
5. Lack of good faith.
6. Lack of feasibility.

## IS THE PLAN AN IMPERMISSIBLE MODIFICATION OF THE BANK'S MORTGAGE UNDER § 1322(b)(2)?

■ In chapter 13, a debtor has two alternatives in the treatment of a mortgagee's claim. The debtor may either modify the mortgagee's claim in some manner under § 1322(b)(2) or may "cure and de-accelerate" a default in the mortgage under § 1322(b)(5). Modification under § 1322(b)(2) is involved here.

■ § 1322(b)(2) provides that a chapter 13 plan can modify the rights of secured creditors, other than the rights of a secured creditor whose security consists solely of the debtor's principal residence. The debtors' chapter 13 plan seeks to extend the time for repayment of their matured loan from November 20, 1990 (which was before the filing of this chapter 13 case) until the 60th month of their proposed 5-year chapter 13 plan. This clearly is a modification. *In re Seidel,* 752 F.2d 1382 (9th Cir.1985). Under the particular facts in *Seidel,* the court concluded that § 1322(b)(2) prevented modification of the particular mortgage involved because the only collateral held by the mortgagee was the debtor's residence.

■ The crucial date for determining the extent of a lender's collateral is when the chapter 13 petition is filed. *In re Green,* 7 B.R. 8 (Bankr.S.D.Ohio 1980). When this case was filed on January 23, 1991, the Bank's security was more than the debtors' principal residence. It also included two 80-acre parcels of real estate and another home.

■ The Bank disputes the debtors' ability to use § 1322(b)(2) to modify the mortgage because the plan also contemplates a surrender to the Bank of all collateral other than the principal residence with 30 acres. The Bank characterizes this as impermissible "selective abandonment." Selective abandonment is a common provision found in chapter 11 and 12 plans, albeit somewhat less common in chapter 13 plans. Nothing in § 1322(b)(2) prohibits the debtors from proposing this type of plan.

Other lenders have previously sought to be protected against modification under § 1322(b)(2) by waiving their interests in all collateral other than the debtor's principal residence. These attempts have been rejected by the courts. *See In re Green,* 7 B.R. 8 (Bankr.S.D.Ohio 1980), and *In re Baksa,* 5 B.R. 184 (Bankr.N.D.Ohio 1980).

■ The Bank, relying upon *In re Seidel,* also argues that, because the mortgage matured under its own terms and before the chapter 13 case was filed, it is now too late for the debtors to modify the Bank's security interest. *Seidel* did not permit modification under § 1322(b)(2) because the mortgagee's only collateral was the debtor's principal residence, not because the obligation fell due before the chapter 13 case was filed. The following language in *Seidel* is significant, 752 F.2d at 1387:

Creditors who happened to take a security interest in the debtor's home *along with a security interest in other property* of the debtor were meant to be excluded from the extra protection of subsection b(2)'s ban on modification; their rights could be modified by a Chapter 13 plan.

## IS A BALLOON PAYMENT PERMISSIBLE UNDER § 1322(c)?

■ The Bank asserts that, "there is no case which allows a balloon payment as compliance with § 1322(c) and the debtors cite none." That is an inaccurate assertion. § 1322(c) permits a debtor to modify a secured claim if it is fully satisfied during the life of the plan. A plan culminating in a final balloon payment during the plan period was recognized as appropriate in *In re Crotty,* 11 B.R. 507 (Bankr.N.D.Tex.1981), so long as the court also finds that the debtor has the ability to make the balloon payment. That condition presents a separate issue which is discussed hereafter un-

der the "feasibility" portion of this decision. *See also In re Moran,* 121 B.R. 879, 21 B.C.D. 125 (Bankr.E.D.Okla.1990).

In *Johnson v. Home State Bank,* —— U.S. ——, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), the United States Supreme Court recently declared that a debtor who received a chapter 7 discharge can include a mortgage lien in a subsequent chapter 13 plan, even though the debtor's personal obligation was discharged. The plan in *Johnson v. Home State Bank* contained a final balloon payment. It is significant that nothing in the court's ruling suggests this was improper.

## AMOUNT OF BANK'S SECURED CLAIM

■ The payments to be made by the debtors under their plan, together with a plan provision for a real estate tax escrow to maintain current real estate taxes, provide adequate protection for the Bank's secured claim. The debtors have provided assurance that they have the necessary funds to pay the 1991 real estate taxes as they become due. Although adequate protection is not an issue in this case, the Bank challenges the amount which the debtors have allocated to its secured claim. The Bank insists that its secured claim is not only the stipulated value of the principal residence with 30 acres ($23,500) but also includes the Bank's attorney's fees, late charges, costs and disbursements, for a combined sum of $25,146. The debtors take issue and argue that the Bank's secured claim is $23,500 less the outstanding prior real estate taxes of $3,443, resulting in a secured claim of $20,057.

■ A distinction must be drawn between the value of the property and the value of a creditor's interest in the property. It is the latter value which comprises the secured claim. *In re Balbus,* 933 F.2d 246 (4th Cir.1991).

■ It is only where the value of the property which secures the lien exceeds the amount of the claim that interest and other reasonable fees, charges and expenses provided for under the contract between the parties, may be included as part of the secured claim. 5 *Collier on Bankruptcy* § 1325.06, p. 1325–43. *Drake and Morris: Chapter 13 Practice and Procedure* § 8.05 states in part:

> The creditor holds a secured claim in the amount of the debt or the total value of the collateral, whichever is less. Thus, the court must value the collateral to determine the extent of the creditor's secured claim.

> Section 506(a) directs the court to value the property "in light of the purpose of the valuation and of the proposed disposition or use of such property." If the value of the collateral is less than the debt, then the excess debt is an unsecured claim. Furthermore, any additional costs or charges, including attorneys' fees which are obligations of the debtor under the agreement with the creditor would not be a portion of the secured claim.

*See also, In re Overholt,* 125 B.R. 202 (S.D.Ohio 1990) (where the value of a secured creditor's claim was reduced by the amount of unpaid real estate taxes) and *In re 222 Liberty Associates,* 105 B.R. 798, 801 (Bankr.E.D.Pa.1989) ("There is no question in studying the mass of § 506 determinations which have emanated from this court, that any prior liens, such as tax liens, must be deducted from the fair market value in computing the amount of the putative secured creditor's allowed secured claim....").

The Bank's secured claim is $20,057. The balance of its claim, including attorney's fees, late charges, costs and disbursements, is unsecured.

## REDUCTION IN CONTRACT INTEREST RATE

■ The debtors' plan proposes a decrease in the interest rate on the Bank's secured claim from 10.25% to 10%. The Bank maintains that such a reduction is impermissible, citing *In re Rorie,* 58 B.R. 162 (Bankr.S.D.Ohio 1985). In *Rorie,* the decrease in the interest rate was not allowed because the loan was secured only by a first mortgage on the debtor's princi-

pal residence, and therefore, the ban against modification under § 1322(b)(2) applied. Since that is not the case here, a modification of the contract interest rate is permissible.

■ Courts consider the current market rate of interest in determining the interest rate to be applied on a secured claim in chapter 13 cases. *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 431 (6th Cir.1982). Mr. King, the chapter 13 trustee, testified that the prime rate presently "runs around 8%," "the treasury bill rates are running less than that," and "10% is a fair interest rate." Based upon the prevailing market rate of interest, the risk factor involved, and Mr. King's testimony, the court determines that 10% is an appropriate interest rate.

### GOOD FAITH

■ The Bank further argues that the debtors' plan is "bad faith as a matter of law," citing *In re Terry*, 630 F.2d 634 (8th Cir.1980). *In re Terry* differs materially from the instant case. In *Terry*, the debtor's plan afforded no payments to any creditors, unlike this case which proposes payments to the Bank, Shawano County and some, albeit nominal, payments to the unsecured creditors. Moreover, *Terry* arose before the enactment of § 1325(b) of the Bankruptcy Code. § 1325(b) clarifies that the "good faith" standard does not set any minimum amount or percentage of payments that must be made to unsecured creditors. If a debtor's plan proposes to pay all that the debtor can reasonably afford over three years, then the debtor is entitled to the relief provided for in chapter 13. 5 *Collier on Bankruptcy* § 1325.08 (15th Ed.).

The good faith guidelines are enunciated in the Seventh Circuit in *In re Rimgale*, 669 F.2d 426 (7th Cir.1982), and *Matter of Smith*, 848 F.2d 813 (7th Cir.1988). *Rimgale* and *Smith* both declare that "good faith" depends upon a case-by-case analysis

rather than upon any specified amount or percentage of payments to unsecured creditors. *In re Rimgale*, 669 F.2d at 431, and *In re Smith*, 848 F.2d at 820.

The Bank incorrectly asserts that the debtors' plan is proposed in bad faith because the debtors have refused to pay real estate taxes on their principal residence and have also not provided reasonable access to the 80–acre parcel of land located west of the debtors' residence and to be surrendered to the Bank and which parcel the Bank has characterized as "landlocked." To the contrary, the plan provides for full payment of the outstanding real estate taxes and for reasonable access to the "landlocked" 80–acre parcel by means of an appropriate easement across the 30–acre parcel being retained by the debtors.[1] The requirement of a plan providing access to a surrendered landlocked parcel was discussed in *In re Braxton*, 124 B.R. 870 (Bankr.N.D.Fla.1991). Unlike the plan in *Braxton*, the debtors' plan in this case fully addresses and overcomes this problem.

### FEASIBILITY

The Bank's major attack is focused upon the debtors' ability to maintain their monthly plan payments and make the balloon payment when it falls due in the 60th month of the plan.

Without doubt, the debtors are on a very tight budget. They will be hard-pressed to make the plan payments while also maintaining their living expenses. It will be a struggle, but it is not insurmountable. Since the inception of this case on January 23, 1991, approximately seven months ago, the debtors have demonstrated their ability to maintain both their living expenses and plan payments. The Bank properly points out the risks which will confront the debtors and their family during the term of this plan. Mr. Groff has worked since September, 1990, as a logger. He earns $1,300 to $1,400 per month net. He was described by a witness, Tom Lex, who is a friend and

---

1. The proposed easement in debtors' plan is consistent with the best of three alternatives recommended by Jim Nolan, an independent party appointed by the court with the consent of the Bank and the debtors. Mr. Nolan was appointed after the parties were unable to agree upon a mutually acceptable easement.

neighbor of the debtors, as "a hard worker who has had a few bum raps." Mr. Groff previously worked as a trucker, but because of his poor driving record (which includes a drunk driving violation), he cannot work in that occupation. Mr. Groff's family expenses for himself, his wife and six children whose ages range from 2 to 17 years total $1,195 per month. There is no surplus here. Nonetheless, there are certain intangibles not reflected in this budget. The debtors and their children enjoy good health. John Pingel, who is Mr. Groff's employer, testified that there is a good potential for Mr. Groff to receive pay increases. Mrs. Groff testified as to her frugal practice of canning vegetables grown in a large garden. Fruit from trees located on the debtors' premises also supplements the family's food needs. The court is impressed by the debtors' family lifestyle, resiliency and sheer determination. In *In re Tauscher*, 9 B.C.D. 1425, 1427 (Bankr.E.D.Wis.1982), Judge Dale E. Ihlenfeldt, confronted with a somewhat comparable situation, stated:

> On paper, the Department's argument that the plan is not feasible is correct. Tauscher's budgeted living expenses are substantially greater than his income.... In brief, if Tauscher completes the plan, he will have demonstrated *ipso facto* that it is feasible, whereas if he fails, the two creditors will be in no worse position than before, and in fact will have improved their position to the extent of any payments made under the plan. At the time of the hearing, Tauscher had already made four payments, and he asserted that one way or another, he would make the payments required to complete the plan.... The court believes that he should be given the opportunity to try.

Judge Ihlenfeldt's faith in Mr. Tauscher proved to be well founded because that plan was successfully completed.

The debtors do not carry medical or automobile insurance, and it is unclear from the record if Mr. Groff is covered by workers' compensation. These factors are important, but not conclusive. The debtors are fighting to save their home, and that too must be weighed in the overall picture.

The court has placed little stock in Mr. Lex's offer to provide a guaranty for any future loan which the debtors may need in order to meet the balloon payment when it becomes due. Under the Wisconsin Marital Property Act, Mr. Lex can provide such a guaranty without his wife's consent. However, any lender approving a loan based upon such a guaranty in the absence of a spouse's consent, takes a risk that, in case of default, only the guarantor's non-marital property and the guarantor's interest in marital property is reachable. *See Marital Property Law in Wisconsin*, State Bar of Wisconsin, CLE Books, §§ 4.27 and 6.3(e) (1990). The likelihood of a lender relying upon that kind of guaranty is remote.

The debtors also presented testimony from Kurt Kramer, president of Mattoon State Bank. Mr. Kramer said his bank would be willing to finance a loan to satisfy the balloon when it becomes due if his bank's underwriting standards were met. While this is by no means an ironclad commitment, it is not illusory and is much more attractive than the Lex offer of a guaranty.

## SUMMARY

One of the primary purposes of chapter 13 afforded by Congress to debtors is the ability to retain their property. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), U.S.Code Cong. & Admin.News 1978 at 5787, 6079. The potential obstacles facing the debtors do not make their plan unreachable. Because the debtors have a realistic shot at "making it" while at the same time protecting the Bank's interest, they should be given that opportunity. Judge Scholl aptly commented in *In re Capodanno*, 94 B.R. 62, 18 B.C.D. 908 (Bankr.E.D.Pa. 1988):

> We fail to see where we are doing any favors to persons in dire financial straits by declining to give them a chance to preserve their homes, thereby pushing them closer to or into the growing ranks of the homeless.

All of the Bank's objections to confirmation are overruled, and the debtors' Fourth Amended Chapter 13 Plan is confirmed. A separate order of confirmation shall be entered.