**In the Matter of Jeffery Wayne SMITH, Paulette Monee Smith, Debtors.**

**Bankruptcy No. 97–33632 HCD.**

United States Bankruptcy Court,
N.D. Indiana,
South Bend Division.

May 29, 1998.

848

Annette F. Rush, and Gary L. Calhoun, Kokomo, IN, for Jeffery Wayne Smith and Paulette Monee Smith.

John D. Stoddard, Krisor & Associates, South Bend, IN, Dennis M. Ostrowski, Mapother & Mapother, Louisville, KY, for Chrysler Financial Corporation.

Alexander L. Edgar, South Bend, IN, Assistant United States Trustee.

Tedd E. Mishler, Michigan City, IN, Standing Chapter 13 Trustee.

## MEMORANDUM OF DECISION

HARRY C. DEES, Jr., Bankruptcy Judge.

On October 23, 1997, Jeffery Wayne Smith and Paulette Monee Smith, the debtors, filed their PRE CONFIRMATION AMENDED CHAPTER 13 PLAN. On December 2, 1997, Tedd E. Mishler, Esq., the Standing Chapter 13 Trustee ("Trustee"), filed his objection to the amended plan. On December 4, 1997, the debtors filed a motion to dismiss the Trustee's objection to their amended plan. On February 17, 1998, Chrysler Financial Corporation ("Chrysler") filed its response to the Trustee's objection. The court held a trial on confirmation of the debtors' amended plan and the Trustee's objection on February 25, 1998, and took the matter under advisement on March 22, 1998, following the time allowed for submitting briefs.

### Jurisdiction

Pursuant to 28 U.S.C. § 157(a) and Northern District of Indiana Local Rule 200.1, the United States District Court for the Northern District of Indiana has referred this case to this court for hearing and determination. After reviewing the record, the court determines that the matter before it is a core proceeding within the meaning of § 157(b)(2)(L) over which the court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) and 1334. This entry shall serve as findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52, made applicable in this proceeding by Federal Rules of Bankruptcy Procedure 7052 and 9014.

### Background

On October 7, 1997, the debtors filed their voluntary petition under Chapter 13 of the Bankruptcy Code. On their Amended Schedule B the debtors listed Paulette Monee Smith's interest in "ERISA[1] protected future benefit profit sharing distributions not estate assets."[2] Am. Sch. B at 1. In their

1. "ERISA" refers to the Employee Retirement Income Security Act of 1974, Pub.L. 93–406, 88 Stat. 829, codified at 29 U.S.C. §§ 1001–1461.

2. The court believes that the amended schedule refers to Mrs. Smith's interest in future distribu-

tions from her employer's Profit Sharing Plan. The debtors' original Schedule B listed a joint interest in a "Chrysler [Corporation] Pension Plan and/or Profit Sharing Plan." Sch. B at 1.

amended Chapter 13 plan the debtors proposed to pay administrative claims in full; to make normal monthly mortgage payments on their first and second mortgages against their residence outside the plan; to pay arrearages of $2,370.00 on their first mortgage against their residence inside the plan; to pay the entire indebtedness of $20,800.00 plus 8% interest on their loan with Chrysler which is secured by their 1997 automobile; to pay the replacement value of $11,400.00 for the 1996 vehicle which is the security for a loan with NBD Bank; and to pay a dividend of up to 10% (or as allowed throughout the term of the plan from funds submitted) to general unsecured creditors. Am. Chap. 13 Plan at 1–2. The debtors proposed to fund their amended plan by making monthly payments of $1,733.33 for 36 months (a total of $62,399.88). *Id.* at 1. The debtors also dedicated to the amended plan future tax refunds exceeding "the emergency amount of $500[.00]" which the federal government distributes to the debtors in the tax years included in the plan term. *Id.* at 2.

The Trustee objected to the debtors' amended plan on several grounds. First, he submitted that the amended plan overvalues the debtors' 1997 Dodge Stratus automobile in which Chrysler holds a security interest and substantially discriminates against NBD Bank which holds a security interest in the debtors' other vehicle, a 1996 Dodge Dakota Club Cab, in violation of 11 U.S.C. §§ 1322(b)(2) and 1325(a)(1). Obj. to Am. Plan at 1–3. He noted that the amended plan proposes to repay the entire sum of $20,800.00 owing to Chrysler with 8% interest.[3] The plan does not provide similar favorable treatment to NBD Bank. Second, the Trustee contended that the debtors' amended plan fails to meet the good faith requirement of 11 U.S.C. § 1325(a)(3) because it underprojects the debtors' income and fails to provide a sufficient distribution to unsecured creditors. *Id.* at 3–4. He took the position that the amended plan actually provides for a 0%, rather than 10%, distribution to unsecured creditors. Finally, the

Trustee objected to the amended plan based on 11 U.S.C. § 1325(b)(1)(B), arguing that the debtors are not applying all of their disposable income to make payments under the plan. *Id.* at 4.

In response, the debtors contended that the Trustee's objection is without merit. They submitted that they filed the amended plan in good faith, stating that their amended plan properly includes a cushion for emergencies and accounts for fluctuations in overtime pay which the debtors receive from their employment. Mot. to Dism. Trustee's Obj. at 2–4. The debtors noted that they factored into the amended plan Mrs. Smith's desire to stay at home more with her two small children. *Id.* at 3–4. The debtors took the position that their proposed treatment of Chrysler in the amended plan is equitable under the facts of their case. The debtors explained that they purchased the new 1997 Dodge Stratus in May 1997 and had never made a payment to Chrysler on their car loan prior to filing their voluntary Chapter 13 petition. The debtors attributed the lack of payments to a problem in having the loan payments automatically deducted from Mrs. Smith's paycheck as they had expected. They submitted that the proposed treatment of Chrysler's claim under the amended plan was a good faith attempt on their part to enable them to keep the automobile. *Id.* at 5–8.

In a supplemental brief responding to the Trustee's objection the debtors further argued that they appropriately excluded from the amended plan certain benefits which Mrs. Smith receives under an ERISA-qualified Profit Sharing Plan which is part of the collective bargaining agreements between the International Automobile Workers of America and her employer, Chrysler Corporation.[4] Suppl. Br. at 1–10. The debtors noted that the Profit Sharing Plan includes an anti-alienation clause and contains provisions which give the participants the opportunity to (a) elect to take a distribution under the plan or (b) defer the distribution to a qualified employer-sponsored 401K savings

---

**3.** The debtors purchased the vehicle for a cash price of $18,192.00 in early May 1997. Trustee's Exh. 1, at 1.

**4.** Chrysler and Chrysler Corporation are separate corporations.

plan in the event Chrysler Corporation is profitable in a given year. They explained that this year Mrs. Smith opted to defer her expected profit sharing distribution as permitted under the Profit Sharing Plan to a 401K savings plan sponsored by Chrysler Corporation. The debtors argued that federal law precludes creditors from reaching the benefits of the plan or requiring the debtors to take distributions in cash for the benefit of their creditors. Finally, the debtors submitted that "the amount in question is 'reasonably necessary for the continued support' of the family of the debtor if received or deferred for future care." *Id.* at 10.

Chrysler responded to the Trustee's objection, arguing that the different treatment of Chrysler's and NBD Bank's claims under the amended plan is appropriate under the circumstances. Resp. at 4. Chrysler reiterated that neither Chrysler nor NBD Bank objected to the amended plan.[5] Chrysler submitted that good faith requires the debtors to repay Chrysler in full as they financed their purchase of the 1997 Dodge Stratus with Chrysler shortly before filing their Chapter 13 petition and failed to make any payments on the indebtedness prior to the filing. *Id.* Chrysler noted that its repossession agent picked up the automobile from the debtors on October 7, 1997—the same day the debtors filed their Chapter 13 petition. Chrysler voluntarily returned the vehicle a day later. Chrysler argued that 11 U.S.C. § 1322(b)(2) permits a debtor to modify the rights of claimholders or leave those rights unaffected, and to treat creditors differently based on the unique facts of the case.

At trial Jeffrey Wayne Smith, age 30, testified that he presently earns $11.09 per hour,[6] working as a processor B in a plant that assembles and tests vehicles. Mr. Smith earned gross income of $24,626.91 in 1997. Debtors' Exh. AA at 1. Mr. Smith estimated that his pay will be the same next year. Mr. Smith testified that his wife's gross income from her employment at Chrysler Corporation was approximately $49,500.00 in 1997. Mr. Smith testified that he and his wife attempted to list the value of all of their assets and accurately project their expenditures in their schedules. He indicated, however, that at the time the debtors completed their schedules, he was unaware that their insurance policies had a cash value of approximately $1,000.00.[7]

In their Schedule J the debtors projected that they will have total income of $4,338.90 and expenses of $2,422.00 per month.[8] Trustee's Exh. 7, at 1. The debtors proposed to devote only $1,733.33 of the $1,916.00 in disposable income to fund their amended plan.[9] Mr. Smith stated that any portion of the debtors' federal tax refunds above $500.00 will be paid to creditors pursuant to the terms of the amended plan. Mr. Smith said that he and his wife received a $2,000.00 federal tax refund last year and that they do not usually receive a state tax refund. Mr. Smith indicated that he and his wife intend to use the excess income not committed to the amended plan to pay for unexpected expenses and general maintenance of their property.[10] He testified that their furnace is old and needs to be replaced. Mr. Smith said that the budget set forth in Schedule J is working well, aside from the

5. NBD Bank filed an objection to the debtors' amended plan on January 23, 1998, disputing the proposed payment on its secured claim. The debtors and NBD Bank filed a stipulation resolving the objection on February 17, 1998.

6. This hourly wage includes a shift bonus.

7. The debtors' Amended Schedule B filed on February 23, 1998, lists the cash surrender value of the debtors' insurance policies as $1,046.00. Am. Sch. B at 1.

8. The court takes judicial notice of the debtors' Amended Schedule J filed on March 11, 1998. The amended schedule increases the proposed monthly expenditure for food from $400.00 to

$525.00, bringing the debtors' total projected monthly expenses to $2,547.00. Am. Sch. J, at 1.

9. The debtors' Amended Schedule J lists excess income of $1,791.90 per month and indicates that the debtors intend to devote $1,733.33 of that sum to fund their amended plan. *Id.*

10. The court notes that in additional to the portion of excess income not devoted to make payments under the amended plan, both Schedule J and Amended Schedule J include a budgeted amount of $75.00 per month for "Emergencies." Sch. J at 1; Am. Sch. J. at 1.

amount budgeted for food,[11] and no unexpected expenses have arisen since the filing of the debtors' case. Mr. Smith stated that he and his wife do not have a telephone presently because they have been unable to pay to have it reconnected.[12]

Mr. Smith testified that the debtors purchased their 1997 Dodge Stratus on May 5, 1997. The debtors borrowed $20,525.22 from Chrysler to finance the purchase.[13] Mr. Smith stated that prior to buying the 1997 Dodge Stratus, he and his wife had leased a 1996 Dodge Caravan. They traded the van in and purchased the new automobile. At the time of the trade-in the debtors owed more on the 1996 Dodge Caravan than it was worth. The $20,525.22 loan included the $18,190.00 purchase price for the 1997 Dodge Stratus, a $1,314.21 deficiency resulting from the trade-in of the 1996 Dodge Caravan, $1.25 in certificate of title fees, and $1,019.76 in credit accident and health insurance. Trustee's Exh. 2, at 1. Mr. Smith testified that the payments for the 1997 Dodge Stratus were less than the payments which the debtors were obligated to pay under their prior lease because the Dodge Stratus is a smaller vehicle than the Dodge Caravan. Mr. Smith stated that his wife used a "green slip" from her employer to purchase the 1997 Dodge Stratus. He explained that a "green slip" is a form of discount off the selling price of a Chrysler Corporation product, noting that the actual cost of the 1997 Dodge Stratus was more than $18,190.00.

Mr. Smith testified that at the time he and his wife purchased their 1997 Dodge Stratus, they had no intention of filing a bankruptcy petition. Five months and two days later, he and his wife filed their Chapter 13 petition. Mr. Smith explained that the first payment on the new car loan with Chrysler was due on June 20, 1997, and was supposed to be made by a payroll deduction from his wife's paycheck. The payroll deduction for the new vehicle never took place because Mrs. Smith was eligible to have only one payroll deduction at a time and she already had a payroll deduction in place for the debtors' other vehicle. Mr. Smith testified that when the first payment to Chrysler for the 1997 Dodge Stratus became due, he and his wife did not make the payment. At the end of July 1997 Mr. Smith discovered the problem with the payroll deduction for the new vehicle.

Mr. Smith stated that he first thought about the possibility of filing a bankruptcy petition in mid-August 1997, owing to the difficulties he and his wife were having paying their bills. Mr. Smith noted that they had been unable to make any payments on the new car loan and Chrysler was demanding that the debtors either bring all payments up to date or return the vehicle. Mr. Smith discussed the matter with their attorney. On October 7, 1997, Chrysler repossessed the 1997 Dodge Stratus. On the same date the debtors filed their Chapter 13 petition. Chrysler returned the vehicle to the debtors the next day. At the time of the filing, the debtors still had not made any payments on the indebtedness to Chrysler. Mr. Smith expressed doubt that the debtors could have surrendered the 1997 Dodge Stratus to Chrysler and obtained a loan to purchase another vehicle. He stated that as of the petition date, the debtors were "upside down" on the Chrysler loan.[14] In addition, the debtors were seriously delinquent on their payments to Chrysler and were having trouble paying other bills and expenses. Mr. Smith agreed that no medical emergency or other catastrophe preceded the filing of his and his wife's bankruptcy case. He ex-

11. Mr. Smith testified that although the debtors were living on the $400.00 per month which they budgeted for food in Schedule J, their monthly expenditure for food actually exceeded that amount. Amended Schedule J corrects this problem.

12. Mr. Smith explained that the debtors' gas and telephone services were disconnected prior to the filing of their Chapter 13 petition. He estimated that reconnecting the telephone would cost several hundred dollars.

13. Trustee's Exhibit 1 is a copy of the Credit Application which the debtors executed on May 5, 1997, in connection with the purchase of their 1997 Dodge Stratus. Trustee's Exhibit 2 is a copy of the Retail Installment Contract which the debtors executed in favor of Chrysler on May 6, 1997.

14. In other words, they owed more to Chrysler than the vehicle was worth.

plained that they simply could not pay their bills.

At the § 341 meeting Mr. Smith testified that he thought the fair market value of the 1997 Dodge Stratus was $18,000.00.[15] At trial he stated that he is uncertain of the actual value of the vehicle.[16] Mr. Smith testified that he and his wife believe that it is fair to repay 100% of the obligation to Chrysler, owing to the fact that they had owned the vehicle only a short time and had not made any payments to Chrysler prior to filing their bankruptcy petition. The debtors also intend to retain their 1996 Dodge Dakota pick-up truck which Mr. Smith described as being in "fair condition." Mr. Smith drives the pick-up truck to work and the debtors use the 1997 Dodge Stratus for family trips to visit relatives and for his wife's transportation to and from work. He stated that the 1997 Dodge Stratus is a four-door family car, rather than a luxury vehicle. Mr. Smith agreed that he and his wife have proposed to treat Chrysler and NBD Bank differently in the amended plan, but took the position that the disparate treatment is warranted by the unique facts surrounding the filing of the bankruptcy case.

Mr. Smith testified that he is uncertain whether or not he has rights in a pension plan through his employment at the present time. He noted that he has been employed by his current employer for 71/2 years. Mr. Smith believes that he will become entitled to a pension some time in the future. Mr. Smith said that his wife has worked for Chrysler Corporation for 4 years. He explained that his wife participates in a Profit Sharing Plan at work and has the right to invest her profit sharing benefits in her retirement plan or receive the funds in cash. Mrs. Smith receives benefits under the Profit Sharing Plan only if Chrysler Corporation is profitable in a given year. Mr. Smith testified that his wife has received monies from the Profit Sharing Plan three different times during her employment in lieu of placing the benefits in her retirement plan. Some time after October 7, 1997, Mrs. Smith elected to place this year's profit sharing benefits in her retirement plan instead of taking the cash.

Paulette Monee Smith, who is 29 years old, testified that at the end of September 1997 she and her husband talked to their attorney about filing a bankruptcy case. At that time the debtors were behind on their first and second mortgages and other bills. Mrs. Smith stated that the options available to her and her husband were to (1) come up with the money to make the back payments on their bills, (2) attempt to refinance the 1997 Dodge Stratus, (3) permit Chrysler to repossess the vehicle, or (4) voluntarily surrender the 1997 Dodge Stratus to Chrysler. Mrs. Smith testified that she and her husband did not have the money to bring their delinquent payments current. In addition, the debtors were unsuccessful in getting their 1997 Dodge Stratus refinanced. After speaking to their attorney, the debtors elected to file their Chapter 13 case. Mrs. Smith indicated that she and her husband learned that if they did not propose to pay Chrysler in full under their amended plan, Chrysler would have grounds to allege that they filed their amended plan in bad faith.

Mrs. Smith testified that her Profit Sharing Plan at Chrysler Corporation includes an election provision whereby a participant who is eligible for a distribution has the option of rolling the payment into a deferred pay plan for retirement or taking cash.[17] The Profit Sharing Plan includes a non-assignability provision which states:

> Except as provided in Article IV, Section 4.04, no right or interest of any Participant under this Plan shall be assignable or transferable, in whole or in part, either directly or by operation of law or otherwise, including, without limitation, by execution, levy, garnishment, attachment, pledge or in any other manner, but excluding devolution by death or mental incompetency; no attempted assignment or

---

15. The court believes that Mr. Smith valued the car as of the petition date.

16. Mr. Smith noted that he does not work on cars or assess their value.

17. Debtors' Exhibit DD is a copy of the relevant portions of the agreements between Chrysler Corporation and the United Autoworkers relating to the Profit Sharing Plan.

transfer thereof shall be effective; and no right or interest of any Participant under this Plan shall be liable for, or subject to, any obligation or liability of such Participant.

Debtors' Exhibit DD, § 6.04, at 149 and 150.[18] Mrs. Smith testified that Debtors' Exhibit EE is a copy of a letter from the Internal Revenue Service dated November 19, 1997, determining that the Profit Sharing Plan is ERISA-qualified.

Mrs. Smith stated that she did not have any monies coming to her from the Profit Sharing Plan at the time she and her husband filed their petition. She testified that she received a notice in January 1998, notifying her that Chrysler Corporation would be making distributions under the Profit Sharing Plan this year. Mrs. Smith testified that she has no way of knowing in advance whether or not Chrysler Corporation will make a distribution under the Profit Sharing Plan in a given year. Although in prior years Mrs. Smith had taken her distribution from the Profit Sharing Plan in cash, she elected to defer the distribution (totaling just over $4,000.00) this year. Mrs. Smith explained that as the prior cash distributions were taxed at 42%, the debtors determined that it would be unwise for Mrs. Smith to take the distribution in cash. Last year Mrs. Smith received a gross distribution of $6,594.16 from the Profit Sharing Plan. The net cash payment was about $3,861.00. Mrs. Smith stated that her total gross earnings in 1997, including the cash distribution from the Profit Sharing Plan, were $49,577.05. She testified that her base pay is approximately $43,-492.80 and that her actual income varies somewhat from that amount, owing to short-term layoffs [19] and overtime. The debtors have proposed to devote Mrs. Smith's base pay of $3,624.40 per month ($20.91 per hour including a shift bonus X 40 hours per week) plus overtime of $128.00 per month to the amended plan although her gross earnings did not reach that amount last year.

Mrs. Smith stated that she and her husband have reserved the first $500.00 of federal income tax refunds and a minimal amount each month to cover extraordinary maintenance costs and emergencies. She explained that a repairman informed the debtors last year that they need to replace their furnace. Mrs. Smith acknowledged that she and her husband have never had a budget. She vowed that they would live up to the terms of the amended plan even though they may have some difficulty doing so. Mrs. Smith indicated that she was not aware that the debtors' insurance policies had a cash value until their attorney informed her of that fact. Mrs. Smith estimated that she would have had to pay an additional $1,000.00 or more for the 1997 Dodge Stratus if she had not been able to use a "green slip" discount in making the purchase. Mrs. Smith denied that the 1997 Dodge Stratus is a luxury car. She stated that sometime in the middle of last year, she changed her tax withholding form to have less money withheld from her paycheck.

Ronald Elders, a dealer relations manager with Chrysler, testified that Chrysler and Chrysler Corporation are two different entities. He noted that an individual's eligibility to obtain credit from Chrysler is not tied to his or her employment with Chrysler Corporation.[20] In addition, he testified that an individual's failure to pay an obligation to Chrysler will not affect adversely the individual's employment status with Chrysler Corporation. Mr. Elders explained that Chrysler offers no special treatment for employees of Chrysler Corporation aside from an employee purchase plan, called the "green slip" program. He stated that the "green slip" program permits employees of Chrysler Corporation to purchase vehicles manufactured by Chrysler Corporation for 3% less than the amount of a dealer's invoice (typically a discount of $300.00 to $500.00). The debtors utilized the "green slip" program in purchasing their 1997 Dodge Stratus. Mr. Elders

18. These numbers are the printed page numbers of the agreement.

19. She explained that last year Chrysler Corporation sent workers home for a week when parts were not available.

20. He noted that Chrysler has denied loans to employees of Chrysler Corporation.

stated that the debtors had a "B+ credit rating" at the time they obtained the loan for the 1997 Dodge Stratus and received a special financing rate of 3.9% on the loan as a result of their good credit standing.[21] He testified that in light of the facts surrounding the debtors' indebtedness to Chrysler, Chrysler possibly would have filed an objection to the amended plan if the debtors had not proposed to pay Chrysler in full. Mr. Elders stated, however, that he would not expect for Chrysler to receive more than the 3.9% contract rate of interest over the life of the amended plan.[22]

### Discussion and Decision

The issue before the court is whether or not the debtors' amended plan meets the requirements of 11 U.S.C. §§ 1322 and 1325 for confirmation. Specifically, the court must determine (1) whether or not the debtors' proposed treatment of Chrysler's and NBD Bank's claims is proper under § 1322(a)(3) and (b)(1); (2) whether or not the debtors have proposed their amended plan in good faith as § 1325(a)(3) requires; and (3) whether or not the amended plan meets the disposable income test of § 1325(b)(1)(B). The court will address these matters in turn.

1. *Proper treatment of Chrysler's and NBD Bank's claims under 11 U.S.C. § 1322*

■■■ The Bankruptcy Code permits Chapter 13 debtors to classify claims in a manner much like that permitted in Chapter 11 cases. Title 11 U .S.C. § 1322 states in relevant part:

(a) The plan shall—

. . .

(3) if the plan classifies claims, provide the same treatment for each claim within a particular class.

(b) Subject to subsections (a) and (c) of this section, the plan may—

. . .

(1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but may not discriminate unfairly against any class so designated . . . ;

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims . . . .

11 U.S.C. § 1322(a)(3), (b)(1)-(2) (West Group 1998). These sections do not require a debtor to classify all unsecured claims in a single class. *Eck v. Willis (In re Willis)*, 197 B.R. 912, 914 (N.D.Okla.1996). As one court explained, "[u]nlike a Chapter 7 liquidation, unsecured creditors have no right to a pro rata payment in a Chapter 13 [case]." *In re Games*, 213 B.R. 773, 777 (Bankr.E.D.Wash. 1997) (citing *In re Tucker*, 159 B.R. 325 (Bankr.D.Mont.1993)). The language of § 1322(b)(1) shows that Congress intended to permit a debtor to create classifications and "that some discrimination be allowed." *Id.* The debtors have the burden to prove that the proposed classification of a claim does not discriminate unfairly. *Groves v. LaBarge (In re Groves)*, 39 F.3d 212, 214 (8th Cir. 1994) (citing *In re Scheiber*, 129 B.R. 604, 606 (Bankr.D.Minn.1991)); *In re Davis*, 209 B.R. 893, 895 (Bankr.N.D.Ill.1997) (citing *In re Liggins*, 145 B.R. 227, 230 (Bankr.E.D.Va. 1992)); *In re Delauder*, 189 B.R. 639, 644 (Bankr.E.D.Va.1995) (citation omitted); *also In re Chandler*, 210 B.R. 898, 902 (Bankr. D.N.H.1997) ("[S]ection 1322(b)(1) only prohibits *unfair* discrimination.").

■■■ As the Bankruptcy Code itself does not delineate what constitutes fair or unfair discrimination, courts have looked to various factors in deciding that issue, including:

(1) whether the discrimination has a reasonable basis;

(2) whether the debtor can carry out a plan without the discrimination;

---

**21.** He stated that anyone with a credit rating of "B" or better would have qualified for the 3.9% special financing rate for a 60-month car loan.

**22.** The amended plan provides for interest of 8% per annum on the indebtedness to Chrysler.

(3) whether the discrimination is proposed in good faith; and

(4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination.

*Davis,* 209 B.R. at 895 (quoting *McCullough v. Brown,* 162 B.R. 506, 508–09 (N.D.Ill.1993) (citing *In re Leser,* 939 F.2d 669, 672 (8th Cir.1991)));[23] *Games,* 213 B.R. at 777 (citing *Amfac Distrib. Corp. v. Wolff (In re Wolff),* 22 B.R. 510 (9th Cir. BAP 1982)). Other courts have viewed fairness from the creditors' point of view, looking in part to whether the proposed preferred payment to one creditor will harm or delay other creditors. 209 B.R. at 895 (citing *In re Eiland,* 170 B.R. 370, 378 (Bankr.N.D.Ill.1994); *McCullough,* 162 B.R. at 512 (citing *In re Smalberger,* 157 B.R. 472, 475 (Bankr.D.Or.1993), *aff'd,* 170 B.R. 707 (D.Or.1994); *Scheiber,* 129 B.R. at 606); *see also In re Strausser,* 206 B.R. 58, 60 (Bankr.W.D.N.Y.1997) (applying a five-part test with fairness from the creditor's perspective as the fifth element)). Whatever test it employs, the court ultimately must determine whether a Chapter 13 plan unfairly discriminates against creditors by looking to the specific facts of the case before it. *Davis,* 209 B.R. at 896 (citing *Eiland,* 170 B.R. at 378); *In re Kolbe,* 199 B.R. 569, 574 (Bankr.D.Md.1996) (citing *In re Delauder,* 189 B.R. 639, 644 (Bankr.E.D.Va.1995)).

Competing public policy considerations include the overall goal of giving the debtor a "fresh start," the need to protect creditors from debtors who may seek to manipulate classifications to discriminate unfairly against a particular creditor or type of debt, and the idea that certain debts (such as child support) take priority over other claims. *Chandler,* 210 B.R. at 902–03. As one court explained:

> Chapter 13 debtors have proposed, and many courts have approved, separate classifications for certain parties: (a) landlords; (b) attorneys; (c) doctors; (d) trade creditors; and (e) banks extending credit necessary for the continued operation of a Chapter 13 debtor's business. *See In re*

*Groves,* 39 F.3d 212 (8th Cir.1994). Hence, the discrimination right exists in a Chapter 13 [case]. There is no automatic denial of a Chapter 13 Plan because of discrimination among the classes. Instead, the statutory prohibition of 11 U.S.C. § 1322(b)(1) requires one to discriminate "fairly" as opposed to "unfairly."

*In re Gonzalez,* 206 B.R. 239, 240 (Bankr. S.D.Fla.1997). The *Davis* court pointed out that if the Bankruptcy Code did not permit some degree of disparity in treatment among unsecured creditors, "the 'discriminates unfairly' language of § 1322(b)(1) would be meaningless." 209 B.R. at 896.

■ Reviewing the relevant facts in this case, the court finds that the debtors' proposed payment in full of Chrysler's claim is permissible under § 1322. The court is persuaded by the debtors' testimony that they did not intend to file a bankruptcy petition at the time they purchased the 1997 Dodge Stratus from Chrysler. The court finds that the problem with the payroll deduction for the vehicle payment and other circumstances led to the filing of their Chapter 13 petition. The court finds no evidence to support the view that the debtors proposed the treatment of claims set forth in the amended plan in bad faith. To the contrary, the undisputed testimony of the debtors is that they chose to treat Chrysler's claim as fully secured to illustrate their good faith in proposing the amended plan. The court finds the debtors' testimony to be credible. The debtors explained that they recognized that Chrysler had good reason to be upset by the filing of their Chapter 13 petition, owing to the fact that they had purchased a new car from Chrysler only five months prior to the petition date and made no payments on the debt prior to filing their Chapter 13 case.

The court finds that permitting the debtors to reduce their obligation secured by the 1997 Dodge Stratus when they have made no payments at all to Chrysler would create a "virtual windfall" in their favor. *In re Barnes,* 191 B.R. 963, 965 (Bankr.M.D.Ga. 1996). In *Barnes,* the court considered the

---

**23.** The *Davis* court noted that the *McCullough* court actually criticized this four-factor test "as 'amorphous,' 'abstract,' 'illogical,' and 'circu-

lar.'" 209 B.R. at 895 (citing *McCullough,* 162 B.R. at 509–12).

inequity of a debtor's plan to pay less than the amount due under the original contract for a car which she had purchased 105 days prior to filing her Chapter 13 petition. The court found:

> Despite the fact that the need to file this case was caused by other circumstances, if the Debtor's plan is confirmed, it will create a virtual windfall for the Debtor in allowing her to reduce her obligations under the contract with Federal [Credit Company] within a short time after taking possession of the vehicle while at the same time retaining all of the benefits of that contract in the form of the vehicle for herself. Such a benefit and its corresponding detriment occurring so soon after the transaction was undertaken is simply unfair and unsuitable to the equitable environment in which cases in this court must exist.

*Id.* at 965. The court concluded that although the debtor could modify the interest rate and extend the term of her car loan, she could not propose a plan to repay less than the full contract amount to her creditor. *Id.* at 966.

■ Although the *Barnes* decision is not binding on this court, the court finds its reasoning to be persuasive. Considering the similar circumstances in this case, this court concludes that the debtors have carried their burden of showing that their amended plan does not "unfairly discriminate" against NBD Bank or the other unsecured creditors. Contrary to the Trustee's arguments, the court finds that § 1322 does not require a debtor to classify and treat two claims secured by similar collateral identically when the circumstances surrounding those obligations are different. Although Chrysler and NBD Bank each hold a claim secured by an interest in one of the debtors' vehicles, the court finds that the circumstances surrounding the re-

spective loans justifies the difference in treatment of their claims set forth in the amended plan.[24] The court determines based on the debtors' testimony that they did not propose the favorable treatment to Chrysler for the purpose of manipulating classifications to discriminate unfairly against a particular creditor or type of claim. The proposed payment in full to Chrysler is reasonable in that it serves to rectify the unfairness which would result to Chrysler if the debtors chose to pay less than the full amount of its claim.[25]

■ Finally, the court finds that the debtors likely will be unable to carry out their plan without the proposed disparity in treatment of the claims of Chrysler, NBD Bank, and the general unsecured creditors. Given the unique circumstances preceding the filing of the debtors' case, the court believes that the debtors' good faith in proposing the amended plan would have been suspect if they proposed less than full payment to Chrysler. In addition, the debtors' disposable income appears to be insufficient to fund a plan offering a 100% payout to unsecured creditors. Although the amended plan does not offer identical treatment to creditors, it offers a meaningful distribution to all creditors, including NBD Bank, and does not substantially harm the unsecured creditors' interests. The court does agree with the Trustee, however, that the proposed increase of the percentage to be repaid to Chrysler under the amended plan from the special contract rate of 3.9% to 8.0% is unwarranted. As Chrysler will receive payment of its claim in full under the terms of the amended plan, no additional compensation by way of an increased interest rate is warranted. With the exception of the increased interest rate to be paid to Chrysler under the amended plan which should be no higher than the contract interest rate of 3.9% per annum, the court

24. The fact that NBD Bank has withdrawn its objection to the amended plan and does not oppose the proposed treatment of its claim under the amended plan supports the court's finding on this issue.

25. As the parties presented no expert testimony concerning the value of the debtors' 1997 Dodge Stratus for purposes of the amended plan, the court makes no precise determination of the val-

ue. Based on the cost of the vehicle at the time of purchase, the amount of the "green slip" discount which the debtors received, and Mr. Smith's testimony at the § 341 meeting that the vehicle was worth $18,000.00, the court believes that the debtors are proposing to pay Chrysler approximately $2,000.00 to $2,800.00 more than the vehicle is worth.

finds that the amended plan is acceptable under § 1322.

## 2. *The good faith requirement of 11 U.S.C. § 1325(a)(3)*

The Trustee next alleged that the debtors failed to propose their amended plan in good faith as 11 U.S.C. § 1325(a)(3) requires. The Court of Appeals for the Seventh Circuit has determined that the good faith inquiry with regard to the filing of a Chapter 13 plan "is a fact intensive determination." *In re Love*, 957 F.2d 1350, 1355 (7th Cir.1992) (citing *Ravenot v. Rimgale (In re Rimgale)*, 669 F.2d 426, 431 (7th Cir.1982)). The Seventh Circuit has directed bankruptcy courts "to look at the totality of circumstances and, thereby, make good faith determinations on a case-by-case basis." *Id.* (citing *In re Schaitz*, 913 F.2d 452, 453 (7th Cir.1990) and *In re Smith*, 848 F.2d 813, 817 (7th Cir.1988)). As noted above, this court determines that the debtors acted in good faith in proposing the preferential treatment to Chrysler under the amended plan.

■ Although the court has some difficulty with the amount of disposable income which the debtors have reserved for themselves under the terms of the amended plan,[26] the court finds that the debtors have made a sincere effort to repay their creditors through their amended plan. The court determines that with the adjustments set forth in this memorandum, the amended plan is fundamentally fair to all of the debtors' creditors. The court finds no evidence of bad faith on the part of the debtors in proposing the amended plan. In particular, the court concludes that the debtors' testimony that they inadvertently failed to disclose the value of their life insurance policies on their original schedules was credible and that their unintentional omission of the value of the life insurance policies on Schedule B (which has now been corrected) is not evidence of bad faith in proposing the plan.

■ The court further determines that the debtors did not act in bad faith in failing to list Mrs. Smith's profit sharing income on their Schedule I and in deferring potential distributions from the Profit Sharing Plan for future use as permitted under the law. Although on the surface Mrs. Smith's election to defer the 1998 cash distribution under her Profit Sharing Plan (rather than devote the sum to pay creditors) appears suspect, the court believes that the debtors have sufficiently explained the reason for Mrs. Smith's deferral of the cash distribution. The evidence shows that the debtors would have lost a significant portion of the profit sharing benefit to taxes and penalties if Mrs. Smith opted to take a cash distribution in lieu of deferring the monies for future use. The debtors explained that although they previously elected to take profit sharing distributions in cash, they have learned that their decisions to do so were unwise. The debtors also testified that they failed to set aside sufficient funds for their retirement in the past. Considering all of the circumstances, the court finds that the debtors' failure to include Mrs. Smith's profit sharing income (based on last year's W–2 form) in the debtors' current monthly income listed on their Schedule I and Mrs. Smith's decision to defer the 1998 cash distribution under her Profit Sharing Plan are not evidence of bad faith on the part of the debtors. In summary, the court concludes that the debtors are attempting to make a meaningful distribution to creditors under the terms of their amended plan and that they have proposed the plan in good faith under § 1325(a)(3).

## 3. *The disposable income test of 11 U.S.C. § 1325(b)(1)(B)*

The Trustee argues that the debtors' amended plan fails to meet the disposable income test of 11 U.S.C. § 1325(b)(1)(B) because the amended plan: (1) makes no dividend to unsecured creditors, (2) is based upon a budget which underprojects the debtors' income, (3) fails to devote the debtors' entire projected tax refunds over the next three years to fund payments to creditors, and (4) fails to devote all of the debtors' projected disposable income to fund payments to creditors. With respect to the debtors' budget, the Trustee contended that the debtors failed to include as projected

---

**26.** The court will discuss this problem more fully below.

income the debtors' overtime pay and annual distributions from Mrs. Smith's Profit Sharing Plan. The Trustee further took the position that the monies which the debtors have reserved for emergencies and/or general maintenance of their property is excessive and impermissible under § 1325(b)(1)(B).

Title 11 U.S.C. § 1325(b)(1)(B) states:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

. . .

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

11 U.S.C. § 1325(b)(1)(B) (West Group 1998). "Disposable income" under this subsection is "income which is received by the debtor and which is not reasonably necessary to be expended . . . for the maintenance or support of the debtor or a dependent of the debtor . . . ." 11 U.S.C. § 1325(b)(2)(A) (West Group 1998). The court will discuss the Trustee's concerns relating to these sections.

### a. Overtime income

 Initially, the court notes that it is not so concerned with whether the amended plan makes a dividend to unsecured creditors as it is that the amended plan devotes *all* of the debtors' projected disposable income to make payments to creditors as § 1325(b)(1)(B) requires. The court believes that the debtors credibly testified about the variations in their overtime work and have included an accurate projection of income from overtime in their total projected monthly income listed on Schedule I. The court finds, however, that the Trustee's concerns about additional overtime income to which the debtors may become entitled during the life of their amended plan are warranted. As these particular debtors have earned signifi-

cant amounts of overtime pay in the past, the court finds that one can reasonably expect that they will have the opportunity to earn similar overtime pay in the next three years. To protect their creditors' interests, the court will require the debtors to provide copies of their paycheck stubs and year-to-date earnings to the Trustee once every six months, commencing six months from the date of confirmation. In the event the debtors receive overtime in a given month during the plan term exceeding the projected amount set forth on Schedule I, the court will require the debtors to increase their plan payment to the Trustee for that month in an amount equal to the net increase in income attributable to the additional overtime work.

### b. Cushion for emergencies and property maintenance

The court next turns to the proposed cushion which the debtors have set aside in the amended plan for emergencies and/or general maintenance of their property. At the confirmation hearing the debtors explained that they intended to use the $183.57 in monthly excess income set forth on Schedule J as well as the first $500.00 in federal tax refunds received during the plan term as a cushion for emergencies, maintenance, and/or unexpected expenses. In addition, the debtors set aside $75.00 each month for emergencies. Sch. J at 1. The debtors represented that the remainder of any federal tax refunds received during the plan term will be devoted to plan payments.[27] Following the confirmation hearing, the debtors filed their Amended Schedule J, increasing the monthly amount budgeted for food from $400.00 to $525.00, and decreasing the amount of the debtors' projected excess monthly income from $183.57 to $58.57. The $75.00 allotment for emergencies and the debtors' reserve of the first $500.00 of federal tax refunds received during the plan term remains unchanged. Am. Sch. J at 1; Am. Pl. at 2.

 Mr. Smith explained at the hearing that the debtors' actual monthly expendi-

---

27. The amended plan expressly provides for the payment to creditors of all but the first $500.00 of each federal tax refund received during the plan term. Am. Plan at 2. This provision is mandatory as the federal tax refunds are income which is subject to the disposable income test of § 1325(b)(1)(B).

ture for food exceeded the amount originally budgeted. The court finds that the allotment of $525.00 per month for food is reasonable for the debtors' family of four. Although the debtors have appropriately included a cushion for emergencies in their amended plan and Amended Schedule J, the court concludes that the debtors' present budgeted amount of $175.24 per month (or $2,102.84 per year) [28] for emergencies and property maintenance is excessive. As the debtors have two late model vehicles and had not incurred any unforeseen expenses as of the date of the confirmation hearing, the court finds that the monthly amount of $58.57 plus the first $500.00 of any federal tax refunds received during the life of the amended plan (a total of approximately $100.00 per month) should be a sufficient cushion for the debtors for emergencies, property maintenance, and unexpected expenses.[29] The court accordingly will require the debtors to increase the monthly amount to be paid to creditors under the amended plan by $75.00 per month from $1,733.33 to $1,808.33.[30] The court declines to increase the cushion in the debtors' budget to cover the cost of replacing or repairing the debtors' furnace because they failed to present any evidence concerning the nature of the problem with the furnace or the anticipated cost of its replacement or repair.

### c. Profit Sharing Plan benefits

The court next considers whether or not the debtors must include potential cash distributions from Mrs. Smith's Profit Sharing Plan as a part of their projected income under the amended plan. In *Patterson v. Shumate*, 504 U.S. 753, 760, 112 S.Ct. 2242, 2248, 119 L.Ed.2d 519 (1992), the United States Supreme Court held that anti-alienation provisions in ERISA-qualified plans, such as the Profit Sharing Plan at issue in this case, are enforceable in bankruptcy

cases. As a result, the Supreme Court determined that the debtor's interest in an ERISA-qualified pension plan valued at $250,000.00 as of the commencement of the debtor's Chapter 7 case was excluded from property of his estate under 11 U.S.C. § 541(c)(2). *Id.* at 2245–50. The Supreme Court's ruling in *Patterson* encompasses all ERISA-qualified "employee benefit plans" with anti-alienation clauses required by § 206(d)(1) of ERISA, including profit sharing plans. *In re Baker*, 114 F.3d 636, 638–39 (7th Cir.1997) (holding that funds in an ERISA-qualified profit sharing plan which contained a proper anti-alienation clause were not property of the debtor's Chapter 7 estate); *Barkley v. Conner (In re Conner)*, 73 F.3d 258, 259–60 (9th Cir.1996) (holding that funds in an ERISA-qualified profit sharing and pension plan, including employee's after-tax contributions, were not property of the debtors' Chapter 7 estate), *cert. denied,* —— U.S. ——, 117 S.Ct. 68, 136 L.Ed.2d 29 (1996).

Importantly, *Patterson* addressed the debtor's interest in an ERISA-qualified pension plan as of the date of the filing of a debtor's Chapter 7 petition, not pension plan benefits actually paid to the debtor following the filing of a Chapter 13 case. In *Brosamer v. Mark*, 561 N.E.2d 767, 770–71 (Ind.1990), the Indiana Supreme Court held that the anti-alienation protection afforded to ERISA-qualified benefits under a pension plan ends when the benefits are actually paid to the employee and not rolled over into another pension plan within the time permitted under the law. The court explained: "We think that the available federal case law supports the conclusion that Congress intended to assure pensioners receive their benefits. It does not demonstrate that Congress desired to make pensioners judgment proof by legislative decree." *Id.* at 770. *Accord NCNB*

---

**28.** This sum includes the line item budgeted amount of $75.00 per month on Amended Schedule J, the $58.57 per month in excess income listed on Amended Schedule J which is not devoted to making plan payments, and the first $500.00 of each federal tax refund received during the plan term.

**29.** At the confirmation hearing the court stated that a $183.00 monthly cushion would be per-

missible. Upon a more careful consideration of the facts, the court determines that the cushion should not exceed $100.00 per month.

**30.** The court's ruling on this issue will result in payment of another $2,700.00 to the debtors' creditors over the life of the amended plan ($75.00 X 36 months = $2,700.00).

860

*Financial Services, Inc. v. Shumate*, 829 F.Supp. 178, 180 (W.D.Va.1993) ("[O]nce the line of actual receipt is crossed, ... ERISA no longer protects funds despite their origination in an ERISA-qualified pension plan"), *aff'd, Nationsbank of North Carolina, N.A. v. Shumate*, 45 F.3d 427 (4th Cir.1994), *cert. denied*, 515 U.S. 1161, 115 S.Ct. 2616, 132 L.Ed.2d 859 (1995); *Eickhoff v. Eickhoff*, 263 Ga. 498, 503–04, 435 S.E.2d 914, 919 (Ga. 1993). This court finds that the *Brosamer* case remains good law today and that its principles apply to benefits actually paid to an employee under an ERISA-qualified profit sharing plan.

■ Based on the undisputed evidence in this case, the court concludes that Mrs. Smith's Profit Sharing Plan is an ERISA-qualified employee benefit plan which contains a proper anti-alienation clause. Pursuant to the Supreme Court's ruling in *Patterson*, the anti-alienation provisions of the Profit Sharing Plan are enforceable until Mrs. Smith actually receives the funds held in trust for her benefit. In accordance with the principles of *Brosamer*, once the benefits under an ERISA-qualified profit sharing plan reach the hands of the employee, they are no longer protected by the anti-alienation provisions of ERISA. Hence, monies held in the Profit Sharing Plan or a qualified 401K savings plan for the benefit of Mrs. Smith and/or her family members are not property of the debtors' estate. In addition, this court holds that undisbursed or deferred benefits are not "disposable income" to the debtors within the meaning of § 1325(b)(1)(B). On the other hand, if at any time following the commencement of a Chapter 13 case and prior to the conclusion of the Chapter 13 plan a debtor receives a cash benefit (*i.e.*, income) from an ERISA-qualified profit sharing plan, the income is property of the debtor's Chapter 13 estate and is subject to the disposable income test of 11 U.S.C. § 1325(b)(1)(B). In the event Mrs. Smith receives a cash distribution from the Profit Sharing Plan during the term of the amended plan, this court will require the debtors to devote the net proceeds of the distribution (after taxes and penalties) to make plan payments to creditors. *Id.; In re Wood*, 23 B.R. 552, 555 (Bankr.E.D.Tenn.

1982) (benefits under an ERISA-qualified pension plan are property of the Chapter 13 estate and can be used to make plan payments).

■ The Trustee argues that this court should require Mrs. Smith to take future benefits under the Profit Sharing Plan in the form of a cash distribution during the term of the amended plan. The court, however, finds that the protections of ERISA preclude the relief which the Trustee seeks. Just as a court cannot force a debtor to withdraw or borrow pension or retirement monies to fund a Chapter 7 distribution or Chapter 13 plan, this court holds as a matter of law that it cannot require Mrs. Smith to elect to take her benefits under the Profit Sharing Plan in the form of a cash distribution. *Cf. In re Stones*, 157 B.R. 669, 671 (Bankr.S.D.Cal. 1993) ("[T]he [Chapter 13] trustee may not attach the corpus [of an ERISA-qualified pension plan] by forcing the debtor to borrow from it."). Similarly, the court concludes that it cannot order the administrator of the Profit Sharing Plan to make a cash distribution to Mrs. Smith for the benefit of her creditors. *Anderson v. Raine (In re Moore)*, 907 F.2d 1476, 1480–81 (4th Cir.1990) (holding that ERISA anti-alienation provisions were enforceable against the Chapter 7 trustee); *John Hancock Mutual Life Ins. Co. v. Watson (In re Kincaid)*, 917 F.2d 1162, 1168–69 (9th Cir.1990). The bankruptcy court simply has no subject matter jurisdiction over the monies in the Profit Sharing Plan which are excluded from the bankruptcy estate and cannot administer the property. *In re McClellan*, 99 F.3d 1420, 1423 (7th Cir.1996).

■ Based on these findings, the court determines that Mrs. Smith's election to defer the income to which she would have been entitled this year under the Profit Sharing Plan to a qualified employer-sponsored 401K savings plan does not violate the disposable income test of § 1325(b)(1)(B). *In re Short*, 176 B.R. 886, 889 (Bankr.S.D.Ind.1995) (holding that a debtor's decision to roll the benefits of her pension plan over into an Individual Retirement Account did not violate the disposable income test because the debtor

was not eligible to receive income from the account without incurring a penalty).[31] Mrs. Smith will receive no disposable income from her Profit Sharing Plan subject to the test set forth in 11 U.S.C. § 1325(B)(1)(b) until she elects to take a distribution in the form of cash or otherwise receives a cash payment of benefits under the terms of the Profit Sharing Plan.

d. Retirement contributions

The court finds that Mrs. Smith's decision to defer her benefits under the Profit Sharing Plan to a qualified savings plan is clearly distinguishable from the situation where a debtor voluntarily elects to contribute a portion of his or her income to a retirement or 401(k) savings plan. *In re Tylvasky, Jr.*, Case No. 94–31061, at *6–7 n. 6 (Bankr.N.D.Ind. March 20, 1995) (Rodibaugh, J.) (dismissing a Chapter 7 case for bad faith when the evidence showed that the debtor had sufficient disposable income—including a monthly contribution to a 401(k) savings plan—to pay a significant portion of his debts in three years). In the latter scenario, the benefit which the debtor elects to defer is income at the time of the transfer. The income is property of the debtor's estate and is subject to the disposable income test of § 1325(b)(1)(B) at the time of the transfer. This court expressly holds that to the extent that the debtors in this case are contributing any portion of their paychecks to a retirement or 401(k) savings plan, those contributions must cease during the life of the amended plan and be devoted to plan payments. This holding does not apply to an employer's contribution to such a retirement or savings plan for the benefit of one or both of the debtors.

*Conclusion*

The court grants in part and denies in part the Trustee's objection and confirms the debtors' amended Chapter 13 plan as modified herein to provide: (1) for the payment of 3.9% (rather than 8%) interest per annum on

Chrysler's allowed claim; (2) that debtors will furnish copies of their paycheck stubs and year-to-date earnings to the Trustee once every six months, commencing six months from the date of confirmation; (3) for the increase in plan payments in a given month by any net increase in income that is attributable to the debtors' overtime work in excess of the projected amount set forth on Schedule I; (4) for an increase in the monthly amount to be paid to creditors under the amended plan by $75.00 (from $1,733.33 to $1,808.33); (5) for the payment to creditors under the amended plan of the net proceeds of any cash distribution which Mrs. Smith receives from her Profit Sharing Plan during the term of the amended plan; and (6) that any voluntary contributions of the debtors' income to a retirement or 401(k) savings plan shall cease during the term of the amended plan and be devoted to plan payments. The court finds that the amended plan, as modified, meets the requirements of 11 U.S.C. § 1322 and 1325 for confirmation, including but not limited to, the prohibition of unfair discrimination against unsecured creditors set forth in § 1322(a)(3) and (b)(1), the good faith requirement of § 1325(a)(3), and the disposable income test of § 1325(b)(1)(B).

SO ORDERED.

*JUDGMENT*

Based on its Memorandum of Decision issued this date, the court grants in part and denies in part the objection of Tedd E. Mishler, Esq., the Standing Chapter 13 Trustee, and confirms the debtors' amended Chapter 13 plan as modified herein to provide: (1) for the payment of 3.9% (rather than 8%) interest per annum on Chrysler Financial Corporation's allowed claim; (2) that debtors will furnish copies of their paycheck stubs and year-to-date earnings to the Trustee once every six months, commencing six months from the date of confirmation; (3) for the increase in plan payments in a given month by any net increase in income that is attrib-

---

**31.** The evidence shows that Mrs. Smith will incur sizable penalties and taxes if she elects to take her profit sharing benefits in cash in a given year. The court determines that this fact is more relevant to the good faith inquiry under 11 U.S.C. § 1325(a)(3), than to the disposable income query of § 1325(b)(1)(B). The court accordingly has discussed it in connection with that issue.

utable to the debtors' overtime work in excess of the projected amount set forth on Schedule I; (4) for an increase in the monthly amount to be paid to creditors under the amended plan by $75.00 (from $1,733.33 to $1,808.33); (5) for the payment to creditors under the amended plan of the net proceeds of any cash distribution which Mrs. Smith receives from her Profit Sharing Plan during the term of the amended plan; and (6) that any voluntary contributions of the debtors' income to a retirement or 401(k) savings plan shall cease during the term of the amended plan and be devoted to plan payments.

The court finds that the amended plan, as modified, meets the requirements of 11 U.S.C. §§ 1322 and 1325 for confirmation, including but not limited to, the prohibition of unfair discrimination against unsecured creditors set forth in § 1322(a)(3) and (b)(1), the good faith requirement of § 1325(a)(3), and the disposable income test of § 1325(b)(1)(B).

SO ADJUDGED.